580 So.2d 1248 (1991)
Alice Marie CARSON
v.
NATCHEZ CHILDREN's HOME, and Julie Mae Bell and Jason Lee Davis, Minors[1].
No. 90-CA-0142.
Supreme Court of Mississippi.
May 3, 1991.
David M. Read, Natchez, for appellant.
Pamela A. Ferrington, Natchez, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
Alice Marie Carson appeals the decree of the chancery court of Adams County terminating her parental rights to two of her children under Miss. Code Ann. § 93-15-103(3)(b). We find the decision of the chancellor supported by substantial evidence not manifestly wrong, and affirm.

*1249 FACTS
Carson is the sole source of her life story. She was born in Natchez in or about the year 1961. She was raised in Boston, Massachusetts. She had four brothers, one of whom was handicapped. She described her mother as a quiet, submissive and long suffering wife, her father as cold, domineering and physically brutal. He rebuffed any effort at affection toward him, and beat her. The three able-bodied brothers sexually abused her. When she informed her parents, she was given a cot in the kitchen to sleep on.
When fifteen years of age, she was raped by a stranger. Her mother advised her not to report it.
In 1978, when she was seventeen, she married Sam Ellis in Boston. He drank excessively and used drugs. He would beat her, and then have sex with her. She divorced Ellis in 1982, and went through a marriage ceremony in Boston with Will Davis. Carson had two children, Debbie Lynn Davis, born May 27, 1981, and Jason Davis, born July 11, 1982. Carson testified Davis was loving with the children, but a heavy drinker who was always broke. She stayed with Davis until January, 1983, and then returned to Adams County where her parents then lived. When she went to get a divorce from Davis, she learned there was no record of her marriage to him.
She married Mark Bell December 12, 1983, who was in the military service. To this union her last child, Julie Bell, was born January 3, 1985. She moved with Bell to Virginia, and separated from him following his stabbing himself in the presence of the children in an effort to avoid being transferred to Panama. Following her separation from Bell, she returned to Adams County. She divorced Bell December 18, 1986.
She started going with Bobby Carson in July, 1986, and married him January 21, 1987. She divorced Bobby Carson in December, 1988. For a while during her marriage to Bobby Carson, she lived in Texas, and also helped him look after his children from a previous marriage.
In 1989 she became attached to another man, Ned Clark, in Adams County, and was living with him during that year.
The record does not reveal the formal education of Carson, but it was apparently quite limited. On July 30, 1986, following a consultation the previous day with the Natchez Children's Home (the Home), an unlicensed facility, Carson delivered her three children to the Home for temporary custody. At the time she was financially unable to provide for them.
Approximately a month later, Julie was placed in night-time foster care with Ramona Roper of Natchez, who at the time was single.
After a period of time Debbie and Jason, especially Debbie, were observed exhibiting overtly sexual behavior. After November, 1986, however, there were only two occasions when Carson could have been involved: a two-to-three day period when she had the children during Christmas, 1986, and a few days when she had the children during the Easter holidays, 1987.
It should also be noted that during the Christmas visit Debbie complained to her mother that a larger boy at school was touching her. Carson reported this to the school, and it was learned that there was substance to this complaint.
Also, in February, 1987, Carson reported to the Home that Debbie had told her a man named "John," who worked at the home was touching her.
When the children returned from the Easter, 1987, visit, a houseparent found Jason playing with a plunger in a sexual manner. When questioned, Jason told her that he and Debbie "touched" each other while they were at their mother's. A few minutes later Jason was seen pulling down another child's pants. When Debbie was questioned about Jason's report of their behavior during their visit, she said it happened.
Also, April 21, 1987, the night they returned, while Debbie and Jason were assigned separate rooms, the two were discovered in Jason's bed, their bottom clothing uncovered. When separated, Debbie *1250 was heard telling Jason, "I'll beat your butt if you tell."
On May 28, 1987, it was reported to Peter Hungerford, the director of the Home, that Debbie and another child had been sexually acting out together. Hungerford and Betty Gideon, a worker at the Home, questioned Debbie, who admitted the act, and that she had initiated it. At that time she told Hungerford and Gideon that during the previous Christmas holidays she had been sexually involved with her mother, her Aunt Joan Logan and Logan's daughter. The contact, according to Debbie, consisted of touching each other in their private areas, and also included Jason and Julie. Debbie told them she had oral sex with Jason, and that her mother had rubbed her in her private areas.
She also reported that when she was five-years-old, her maternal grandfather had touched her, and had oral sex and intercourse with her. She said it hurt when men did it. She also reported intercourse with Mark Bell with her mother present. She said intercourse happened with Bobby Carson "a hundred times."
It should be observed that what Debbie and Jason related to the Home's authorities came from Nancy Hungerford's reading from the Home record notes made of these events. The entire notes were introduced as Exhibit 4 without objection.
There were several hearings concerning the children in the Youth Court of Adams County. Portions of the transcripts of the hearings are in the record.
At the first hearing on October 7, 1986, there was no controversy. Peter Hungerford gave the court a statement of the goals, and told the court that Carson had strong mothering skills but was broke.
There was another Youth Court hearing on May 12, 1987, but no transcript of any of this proceeding is in the record.
At the August 26, 1987, hearing, Peter Hungerford testified at some length. He testified that prior to and since the May 12 hearing the Home had been dealing with the sexual behavior of the children, trying to get a coherent picture. Debbie was noticed kissing, fondling, laying on top of or under younger children than she. When questioned, she was fearful. A tape had been made and given the Youth Court.[2]
As a basis for his conclusion that Debbie had been involved in sexual activity with grown persons, Hungerford testified at the Youth Court hearing:
Specific facts in the multitude of her sexual activity. She  I mean, you know, I've seen all sorts of ranges of different types of children. She exhibited, and many times we have notated, specific sexual activity that is just much, much more than what we could call normal activity.
... .
OK. She had fondled two- and three-year-old boys. Uh, pulled down their pants and fondled them. She has, uh, been seen laying on the ground with an older girl laying on top of her. She has been caught with an older boy fondling her.
(Youth Court Transcript, p. 6; Exhibit 12)
Following the incident on May 28, 1987, in which Debbie was observed with an older girl lying on top of her, Hungerford related how he had called the children in and questioned them. The older girl admitted having sexual contact with Debbie, but that Debbie initiated it. Debbie, when questioned, admitted her involvement. Debbie also named a number of other children with whom she had had sexual contact, ranging from touching to intercourse, which she told him was painful.
When Hungerford asked her who taught her these things, she became fidgety and nervous. She told of her other stepfather, Bell, touching her sexually and having had intercourse with her. She said this had occurred during the Christmas, 1986, holidays. She named her maternal grandfather as having had intercourse with her, and also Bobby Carson, her stepfather. She was afraid of being hurt for telling him, but Hungerford assured her that no one would harm her. He then asked her who had taught her to do sexual things *1251 with girls. Again, after hesitation followed by reassurances, she told him that during the previous Christmas her mother had two friends to visit, Aunt Joan and Aunt Lori (in fact Carson's aunt Joan Logan and Logan's daughter Lori), who had sex with her mother and Debbie. Upon another occasion Debbie had related that her mother taught her to do sexual things.
Following this, the children were evaluated at the Southwest Mental Health Complex and its reports were given to the Youth Court.[3]
On June 15, 1987, there was a discussion between Carson and Hungerford about the developments involving her children. Hungerford said this greatly distressed Carson, who requested them to find foster care for the children until the whole matter was cleared. On July 1, 1987, Jason was placed in a foster home.[4] Hungerford recommended long-term foster care for the children.
There was an extensive cross-examination of Hungerford by Carson's attorney, during which he testified that the Home had suspected unusual sexual activity even before April 20, 1987, but that it was only after the children felt they could trust the people at the Home that their stories began to be revealed.
A medical doctor examined Debbie in July, 1987, and while he found the vagina too long, he found no damage. He told the Home there could have been slight penetration.
Hungerford testified that the Home began making notes on all children in April, 1987.
Hungerford testified that he and Carson talked about the children and their behavior, and at one time she became so distraught she wanted to give them up, and he told her no. Also, she related an incident that occurred during the 1986 Christmas holidays when Mark Bell was found in bed with both the children, and Debbie did not have pants on; Carson was concerned that Bell may have had sex with Debbie.
Hungerford said the children needed long-term foster care in order to give Carson "an opportunity to work through some very difficult issues in her life... . She's going to take time to get her act together, to get her life straight. She's on medication now, she's had a rough life, it's not going to be easy. She needs help." (Youth Court Transcript, p. 24; Exhibit 12).
Hungerford could give no information as to the time needed, stating it could take years, that it was up to a psychologist.[5]
Jason was placed in a second foster home with Keith and Carol Ward in Monroe, Louisiana, in August, 1988. As above noted, Julie had been in the foster care of Ramona Roper Hunt since October, 1986.
On April 4, 1989, there was a petition filed in the chancery court of Adams County to terminate the parental rights of Carson and Davis as to Jason, and on the same date another petition filed to terminate the parental rights of Carson and Bell as to Julie. The chancellor appointed a guardian ad litem for the children.
Neither father answered nor appeared, and both petitions were heard at a chancery court hearing beginning September 13, 1989.
Sandra Geiger, who held a master's degree in marriage and family therapy, testified that on May 29, 1989, the Wards had brought Jason to her for observation and treatment. She spent sixteen and a half hours with him, all but two of which were just between Jason and her.
She described Jason as an extremely intelligent seven-year-old child. Without objection she was asked what incidents were observed by her and indicative of Jason's being a sexually abused child. She replied that the first time the two were alone, she gave Jason teddy bears and during the play *1252 he wanted to take the boy to the bathroom, where he took its pants down, and upon seeing its penis, played with it. Then he took the girl doll in the bathroom and removed her clothes. He flicked the penis of the boy doll, and stroked the genitals of the girl doll, and inserted a finger into it. When he did so, he smiled at Geiger. He named the dolls Debbie and Jason, and asked if it would be all right if they played together naked. He pressed them together, and played with the dolls clothed and unclothed.
Geiger testified there was an element of secrecy, that sometimes Jason did not want her watching him playing with the dolls and sometimes he would make a display in front of her.
Jason told of a bad dream of being put to bed without supper and being "touched in places they shouldn't."
It should be noted that when Geiger first saw Jason, it was over two years after he had last been alone with his mother.
Dr. James Hurley, a professor of marriage and family therapy at Reform Theological Seminary, and director of a family therapy clinic in Jackson, testified as an expert. It was stipulated that he was "an expert in the psychology related field of sexual abuse of children." He had worked with Debbie for nine months, the school year of 1987-88. His objective was to help her adjust to foster care, and facilitate her placement. He described Debbie as a bright, loving, but anxious six-year-old child, all of which was entirely appropriate. In her anxiety she had a tendency to sexually comfort herself by masturbating. She literally commanded affection, and would run across the room, land in Dr. Hurley's arms and rub her genitals against him. "Her behaviors then were very, very highly sexualized."
She was anxious about loss and separation from her mother, was afraid of being abandoned, and wanted to be loved. Her feelings were intense, and she could be loud and disruptive when anxious. She had a difficult time sitting still and cooperating.
He introduced drawings made by Debbie which to him suggested her sexual knowledge and interest, but which interest waned following a period of time.
Q. Is that behavior consistent with a child who has been sexually abused?
A. Yes, there are a number of patterns of approaching that kind of thing. It means that the topic was a very sensitive one for her and one she didn't want to enter into. It would certainly be consistent with being abused, a source of great anxiety. She was willing, however, to discuss one incident. It seems to be one she felt safe enough to discuss and that is an incident and we covered it five times in the course of therapy several months kind of apart.
Q. And what was her 
A. That was a situation where she reports being on her mother's bed in her pajamas; that daddy, whom she identified as [Bobby], came in, put his hand between her legs on her genitals and began to rub in a circular motion and her gesture is like this (INDICATING). I infer that that was an effort to sexually stimulate her and I did pursue that with her. She explains herself as crying out in response to that, describes her mother coming in and doing the same thing, putting her hand on her and stimulating [Debbie Lynn]. I asked her what happened then and after a while it stopped. The picture is consistent each time she tells it. The body awareness is consistent with a young child. She doesn't exhibit great distress around it; anxiety but not anxious distress. I asked her how it might feel to have someone do that. She really didn't want to talk. I asked her if that could feel good. Didn't know if it could feel. Where she is a child who masturbates freely and publicly to have no idea if rubbing the genitals could have feelings with it suggests that that is a fairly distressing topic when it gets picked up in that context. She was free to tell me at other points, not around this, but at other points, that it felt good to be *1253 touched there or to touch oneself there.
Q. Did she differentiate between the two, being touched and touching oneself?
A. Both were anxiety producing for her. No, not really a great deal. She was unwilling to specify beyond [Bobby] and mommy who else would touch her there. She was anxious about telling me that she had touched herself there. I don't think that is surprising and at school we had to discuss that with her because she was doing it in class and talked about this was disturbing to people; it wasn't the way to behave in class. We arranged to have her come in trousers and that helped the process a great deal.
(Parentheses original; brackets ours)
Dr. Hurley said that it would be inconceivable that one incident would produce Debbie's behavior. He stated that the expression of affection from her blended right into sexual stimulation. While this was appropriate with married couples, it was not with strangers. He testified that she had no boundaries of behavior. When asked for his opinion of whether she had been sexually abused, he replied, "Oh, yes." "I would judge that it has happened in relation to her mother and in relation to somebody called Bobby, that much at least."
Dr. Hurley testified that both statistically and operationally sexually abused children were more likely to abuse their children.
Dr. Hurley saw no sign of physical abuse.
Dr. Hurley corroborated Geiger in Jason's behavior around the teddy bear dolls. "He identified the bears as himself and his sister. That is really pretty unusual and that is an understatement. That is just dramatically unusual when you're putting them in sexual sorts of positions." (R. 82)
As to Debbie and Jason being together, Dr. Hurley stated, "Candidly I think that they are at risk if they're together, I mean to be really frank."
Q. Jason and Debbie?
A. Yeah, and it kills me. I think siblings should be alongside one another and grow up together. I think that these two together would seriously be at risk.
Debbie had mixed but positive feelings about her mother, she really wanted to be with her.
He testified that Debbie's behavior and manifestations had improved at the end of his counseling, but Dr. Hurley warned that she would require long-term counseling and adult help. His prognosis for her was tentative. "She doesn't have many years before it is too late." (R. 153)
Nancy Hungerford's testimony from the Home's records and notes of children's behavior have been set out.
James Bart McConnell, an Episcopalian priest, was a sponsor parent for Debbie from August, 1988, until May, 1989. She was in his home twelve to fifteen times. He described her as a sweet and loving child who was very active. He described some incidents of overtly sexual behavior for a small child in her wanting him to rub her "lower," and once touching him in his private area.
Carol Ward testified that she and her husband got Jason in August, 1988. He was an anxious, active child with a short attention span. She gave examples of what to her were manifestations of overtly sexual behavior. He would run the bathtub over. He would get erections, and appeared to her to have a "seductive grin." In wanting her to rub him, his request was similar to Debbie's request to McConnell, that he could be rubbed "down there."
Jason wet the bed, and did so poorly at school that Mrs. Ward quit her job and taught him at home. He had radically improved in September, 1989.
Julie had been with Ramona Roper Hunt for three years at the time of the hearing. She related that when Julie was returned to her following Christmas, 1986, she had a severe diaper rash and a cold. Mrs. Hunt and her husband had a child following Julie's *1254 arrival, and Julie was relating well to the baby.
A contract between the Home and Carson dated February 6, 1988, was introduced as Exhibit 5. The agreement sets out certain goals for Carson in order to attain the ultimate goal of getting her children returned to her. The intermediate goals were that she be self-supporting, secure employment for at least six months at the same job, and not change unless for a better position; obtain low income housing; secure enough resources to enable her to provide adequate housing, food and medical care for her children; and establish a monthly itemized budget. It was further recommended that she attend counseling on a weekly basis, and establish one to three friendships with people who did not drink, do drugs, or engage in any activity that would promote irresponsibility.
To improve her parenting skills, she was to complete a parenting skills class provided by the Mental Health or Home, participate in structured monthly visitations, pay the Home $100 per month for each child, and other requirements designed to encourage her to be a reliable, supportive mother.
The agreement further stated that if she continued in the patterns of instability in relationships, attaching herself to alcoholic or abusive males, and dependency upon the children to meet her emotional needs, she risked having her parental rights terminated.
Diane Hash, a therapist at the Mental Health Center in Natchez, testified on behalf of Carson that she started coming to the center in May, 1989, where she saw her every two weeks. Throughout her counseling Carson denied any sexual involvement with the children and all the charges that had been made in the Youth Court. This was consistent with previous notes of the center. Carson throughout had maintained her complete innocence.
Carson suffered from depression and stress, with a history of mistreatment of her by her father and men she had known. Hash thought Carson was making improvements and that through therapy of Carson and the family, in a year or year and a half the family could be reunited. Hash said her therapy was directed toward helping Carson's parenting skills and mental status.
Carson denied ever having sexually abused her children in any way and, throughout direct and cross-examination, knowledge of any possible abuse by any other person or persons. She denied the allegation that her aunt and cousin sexually abused Debbie during the Christmas, 1986, visit, stating they were only together about two hours in the Joan Logan home, and nothing happened. She testified she got her children on December 23, visited Logan, and spent Christmas at her parents' home in Roxie. Her parents were then separated and not there. She said Debbie and Jason had colds, and Julie a diaper rash.
She said the house had three bedrooms, that she and Bobby Carson slept in her parents' room, the girls across the hall, and Jason in a room by himself. Debbie was distant and eventually cried and told her mother about a thirteen-year-old boy at the Home sexually touching her.
She said her children had exhibited no signs of overt sexual behavior prior to her placing them in the Home. She said the Home placed the children in foster homes without telling her, and that after August 26, 1987, she was never allowed to be alone with the children.
On cross-examination the details of the Christmas, 1986, visit were again brought out. She said that her mother, who was then keeping Carson's grandmother in Brookhaven, came over for a while, and that two of her brothers and one sister-in-law were there. Mark Bell, her former husband, was also there. She testified Bell spent about an hour with Julie. She said Bell and her brothers got to drinking outside the house, and she would not let them back in.
Carson held several different jobs, none of which lasted. She started a course in a junior college, but did not complete it. She had no job at the time of the hearing. The chancellor, however, stated that she had *1255 either substantially or completely fulfilled the 1988 contract.
Carson was extensively cross-examined and questioned by the chancellor. A flavor of her testimony can be gathered from the conclusion of her re-direct:
Q. [Alice], as a result of not only the violent rape that you experienced, but also the abuse that you suffered at the hands of your brothers and uncles and whoever else, do you have what you characterize as a normal sexual relation with men?
A. No, I don't.
Q. How would you characterize your sexual relationships with men?
A. I can't respond.
Q. Have you ever been able to?
A. No, I can't respond normally like anybody else could. I freeze up. (Sobbing)
... .
A. I can't respond, I can't respond to their touches; I just can't feel anything.
THE COURT:
What I'm saying is your past experiences just cause you to be inhibited to where you can't enjoy sex as much as maybe another female could?
A. I can't enjoy it, no.
THE COURT:
All right.
Q. [Alice], I'm about to conclude. Before I do so, I asked you this Monday and I'm going to ask you again, and take your time and compose yourself. Is there anything, anything at all that you want to address to this Court, anything, something that you may have already spoken to and that you want to restate or reemphasize? Is there anything that you want to address to this Court?
A. It's just . Everybody keeps saying that it's a gene pattern, that if it was done to me, I'll do it to my kids, and there's no way I could do that to anybody, because I can't stand  I can't cope and I can't . I have negative feelings to myself about what happened to me. I have grew up with guilt on my shoulders all my life because of it. Only thing I want is to try to prevent that to ever happen to my kids. I want them to have a normal life, to be happy, to enjoy relationships, to be able to love somebody, not to be the way I was brought up, not to do the things . I want them to have a normal life. I don't want them to go through what I did. (Weeping)
THE COURT:
Well, Ms. [Carson], I don't think anybody wants anybody to go through that. Counsel, do you have any other questions?
MR. READ:
Your Honor, I'd like to give her a chance to compose herself in just two or three minutes, and then if she has anything else she'd like to add to what she just said.
THE COURT:
Ms. [Carson], do you have anything else that you'd like to say? I don't want you to feel that you've walked out of this courtroom without having been able to say what you want to say. Is there anything else that you would like to say? And if there is, I'd like to give you a minute to compose yourself.
A. It's just that I love my kids very much. I know I have circled my whole life around them, because I never had the love of my parents the way I should have had. And so I tried to teach my kids how to love and how to return somebody's love, not sex-wise, [but] physical, mentally, but not the sexual part. I try to teach them it's not a shame it's nothing wrong with hugging somebody if you love them. Like my father made me feel like I was doing something wrong when I'd hug him. I'm trying to teach them that it's not a sin to love somebody, but it's a good feeling. I'm trying to teach them how to love and to accept love. I have always had trouble when somebody says they love me; I have always had trouble accepting it. If it wasn't for me overlooking a lot of things that my parents have put me through, I *1256 wouldn't know how to love anybody; I wouldn't know how to express it, because I was determined to prove to them that I was not going to be like them, that I was going to raise my kids different. I wasn't going to beat them, I wasn't going to beat them, I wasn't going to blame them and make them feel guilty, I was going to be a better parent than my parents ever was. That's all I got to say.
MR. READ:
Does the Court have any questions?
THE COURT:
No, I think we've questioned Ms. [Carson] to the hilt. You may ?
MR. READ:
Your Honor, I have one more.
Q. [Alice], are you biologically capable of having any more children?
A. No, I'm not.
(Parentheses original; brackets added)
The September hearing recessed until November 15, 1989. At this time the Home called the court's attention to the portion of the Youth Court transcript in which Hungerford had testified that Carson had reported to him, following the Christmas, 1986, visit, that Bell, without her knowledge had spent the night and slept in the same room with Debbie and Jason, and that Debbie had no pants on. Carson discovered them the next morning.
Carson again took the stand and testified the reason she had not mentioned this incident in the chancery court hearing was that she did not think about it.
The guardian ad litem, Patty Godfrey, a local attorney who had also been a school teacher, testified to her observations of the children preparatory to the hearing. She had observed them in the company of their foster parents, and in the company of Carson. She had no question but that Carson loved the children, and the children loved her, although it was more in the nature of an older sister. Julie looked upon Ramona Roper Hunt as her mother.
She did not question any of the children as to Carson's treatment of them, or any possible sexual abuse.
It was Godfrey's opinion from hearing the case, as well as observing the children, that it was in Jason's and Julie's best interest that the parental rights be terminated and the children separated.
At some time during the trial the chancellor talked to Debbie in chambers. The chancellor's opinion noted that the Youth Court had recommended termination of parental rights, and after setting forth summaries of the witnesses in detail, he related his examination of the children and final conclusion:
Lastly, and perhaps most importantly, the Court must consider the testimony given the Court in Chambers by the three children. It was quite apparent that these children very much love the Defendant and were quite candid in speaking of their affection for her. It was also apparent that these children had not been coached by anyone and that their conversations with me were honest and credible.
These children have been in foster care for some time, and have bonded remarkably well with their foster parents. As stated before, [Jason], through the sacrifice of his foster mother, is quite academically advanced for his age. [Debbie] is a vivacious little girl who is quite outspoken. Likewise, [Julie] is a bright child full of spontaneity and possessed of a wonderful little personality.
When questioned about any sexual abuse, the children become somewhat solemn, and it is obvious that relating these incidences are both embarrassing and painful. However, [Debbie] and [Jason] were responsive to questions, and I was very careful to couch the questions in such a way that they were neither suggestive nor leading in any manner. I truly feel that a termination of parental right case in Chancery court is as grave as a capital murder in Circuit Court. Prior to my conversations with the children, I felt that the case was somewhat balanced. [Alice] had denied any sexual *1257 involvement both passively and actively, and there were no witnesses to her ever having molested the children. The testimony of most of the parties clearly showed that these children have acted out sexually, and the testimony of the psychologist, Dr. Hurley, was especially enlightening as to inferences from that type of behavior. Of course, Dr. Hurley had also had the opportunity to talk with the children, and he related that they had told him that they had been sexually involved with their mother.
[Debbie] did tell Dr. Hurley on many occasions about being touched.
[Debbie] also related to Dr. Hurley that when she was on her mother's bed, [Bobby] came in and put his hands on her genitals and began to rub her. She cried out and her mother came in and did likewise. Dr. Hurley testified that this story never varied much.
This is the same story that [Debbie] told me when I interviewed her during the trial. It was my opinion at the time that [Debbie] was being candid, honest and truthful with me when she related this sexual conduct.
[Jason] was less explicit, but told me that [Alice] had touched him on his "privates" on more than one occasion. I had the distinct feeling that the children did not make these stories up  on the contrary, they were afraid of getting their mother in trouble. Debbie even asked me that if she told the truth would it get her mother into trouble.
At any rate, this has been a very difficult decision in a case for me. I do believe that [Alice] loves her children, and I further believe that the children love her and each other. At any rate, I find that the evidence is clear and convincing that [Alice Marie Carson] has been involved in a series of abusive incidents toward her children, namely sexual abuse, and I further find that that behavior is likely to continue if the children are placed back with her. Therefore I find that the requisites of the statute have been met, and I have no choice but to terminate the parental rights as to the two children, [Jason] and [Julie]. Because of the extreme nature of the consequences of this statute, I do this with the greatest reluctance, but I am forced to be objective and to consider the fact that this is the second court that feels this way, one entirely independent of the other.
I am aware that the Mississippi Supreme Court has on many occasions ruled that siblings should not be split up, and I am aware of the rational [sic] behind these decisions. However, Dr. Hurley testified that it would be a mistake to place these children together because of their past history and their sexual inclinations. I feel that under these circumstances that it is in the best interest of the children and their future that they be placed in different homes.

(Brackets ours)

LAW
The evidence produced in this case has been set forth at greater length and in more detail than is ordinarily recited. We have done so because of its gravity, and all parties are entitled to know it is a burden which has rested heavily upon us.
Carson's counsel quite correctly begins by reminding us that it is presumed that the best interest of a child will be served by remaining in the custody of the natural parent. Rutland v. Pridgen, 493 So.2d 952, 954 (Miss. 1986). Almost as strong is the imperative that siblings should not be required to live apart. Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss. 1983); Mixon v. Bullard, 217 So.2d 28, 30-31 (Miss. 1968).
Our inquiry is whether the chancellor in this case had sufficient evidence to justify making an exception to these rules so wholesome and wise in the overwhelming majority of instances.
Counsel argues there was insufficient evidence to make this exception.
From the testimony of observers and experts, and the chancellor's questioning of Debbie and Jason in chambers, these children had been subjected to numerous *1258 incidents of sexual arousal by, and sexual gratification to different adults. Isolated incidents would not have produced the chronic overtly sexual behavior observed of Debbie and Jason, according to Dr. Hurley. Both children, but especially Debbie, had identified Carson being a participant at times.
The degree of knowledge and participation by Carson in these aberrant practices is not, and may never be known. The chancellor, however, found Debbie and Jason to be victims of child sexual abuse which will permanently injure them emotionally and psychologically. This finding is supported by the record. Hopefully, in time they both may receive care and attention which will help them overcome the inner conflicts, doubts and hurt this sexual abuse has inflicted upon them. There is also ample evidence to support his findings of Carson's knowledge of, or participation in the sexual abuse of her children, or both. While Debbie was the greatest and most unfortunate victim, and is not involved in this case, the treatment of her permeates and infects Jason and, did to a lesser extent, Julie. Even if the sexual abuse had been directed solely to Debbie, as sad and wrenching as it is to say, no mother should be permitted to have custody or control of any children if she permits one child to be molested as was done to Debbie.
We therefore conclude the chancellor had evidence to support the clear and convincing standard required to terminate Carson's parental rights.

I. STATUTE UNCONSTITUTIONALLY VAGUE
Miss. Code Ann. § 93-15-103(3)(b) provides:
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
(b) A parent has been responsible for a series of abusive incidents concerning one or more children;
Carson argues that in order to terminate her parental rights under this statute, child sexual abuse should have been specifically stated, and there was no showing that Carson had been guilty of a "series" of incidents. We find the statute sufficient to encompass child sexual abuse without explicitly stating, and as above noted, that Carson's complicity was shown in considerably more than an isolated incident.

II. FAILURE OF HOME TO CALL PETER HUNGERFORD AND SHARON BLACKWOOD AS WITNESSES
In her final assignment, Carson complains that the trial court erred in not requiring the Home to call Peter Hungerford and Sharon Blackwood as witnesses. She does not assign as error the reading by Nancy Hungerford of the Home's notes and records of observations made of Debbie and Jason, or the introduction into evidence of the entire notes as Exhibit 4. Nor does she complain of the introduction into evidence of the portions of the Youth Court transcript as Exhibit 12 which contained most of Peter Hungerford's relation of incidents. In fact, both exhibits were introduced without objection.
Her complaint is that the trial court did not require the Home to call them to the witness stand as trial witnesses. There is nothing in the record to suggest that Carson subpoenaed these witnesses to testify, or attempted to take their deposition, and if she had wanted them to testify her counsel was under some obligation to get their testimony. The Home was not required to call them as its witnesses.
The sole objective of the chancery court and this Court is to determine, by using all of the best competent evidence available, what is the best interest of these two children. Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983). The discomforting awareness of our human limitations in reaching what in time will prove the best course cannot remove our obligation to decide. As best we can, decide we must.
Accordingly, we affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
*1259 DAN M. LEE, P.J., concurs in result only.
NOTES
[1] Virtually all names have been changed to protect the identity of the children.
[2] This tape is not in this record.
[3] These reports are not in the record.
[4] This was the first foster home in which Jason was placed, an arrangement that did not last. He was later placed in the foster home of Mr. and Mrs. Keith Ward in Monroe, Louisiana.
[5] The transcribed portions of the Youth Court hearings were introduced into evidence without objection as Exhibit 12.