JAMES L. ROBERTS, Jr., Justice,
for the Court:

STATEMENT OF THE CASE

¶ 1. This case comes before the Court on appeal from a decision rendered in Warren County Chancery Court. C.E.J. was granted a divorce from M.C.M.J. and awarded physical custody of their seven-year-old daughter, Child AA. M.C.M.J. was granted the standard visitation rights by the chancellor. M.C.M. J. appeals only the ruling of the chancellor that granted physical custody of Child AA to C.M.J. Specifically, she argues the following:
I. THE COURT ERRED BY AWARDING C.EJ. CUSTODY OF CHILD AA.
¶2. After thoroughly reviewing the record before us, it is the opinion of this Court that the chancellor did not abuse her discretion in awarding custody of the minor child, Child AA, to the father, C.E.J. The chancellor’s decision was supported by substantial evidence. Therefore, the lower court decision should be affirmed.

*775
STATEMENT OF THE FACTS

¶ 3. After the parties began dating in 1989, M.C.M.J., along with her child from a previous relationship, Child BB,[1] moved into C.E.J.’s apartment in Vicksburg. The parties moved to Brunswick, Georgia during the summer of .1989, where Child AA was born on June 25, 1990. In October of 1990, the family moved to Decatur, Alabama in order for C.E.J. to begin working in the insurance business. C.E.J. moved to Offerman, Georgia after his father passed away on February 21, 1991. M.C.M.J. and the children later moved to Offerman in June of 1991, after neighbors reported M.C.M.J. to the Alabama Department of Human Resources for allegedly neglecting the children.
¶ 4. The couple separated in July of 1992, after M.C.M.J. refused to marry C.E.J. She left Georgia and moved back to Vicksburg. In October of 1992, C.E.J. moved back to Vicksburg in order to .work things out with M.C.M.J. In December of 1992, C.E.J., M.C.M.J., and the two children moved into a rented home on Dusty Road in Vicksburg. C.E.J. and M.C.M.J. were married on April 1, 1993. In September of 1994, C.E.J. purchased a home for the family in Vicksburg, where the parties lived until they separated in August of 1995. This final separation was brought about by an incident in which C.E.J. was struck by M.C.M.J. with an axe handle. M.C.M.J. stated that she accidentally hit C.E.J. with the axe handle as she was playing with it in the kitchen. This incident took place while the children were present in the home.
¶ 5. C.E.J. took physical custody of Child AA and moved back to Georgia to be closer to his family. Several weeks later M.C.M.J. came to Georgia and attempted to remove Child AA from school, but was unable to do so. Proceedings were instituted in the Georgia courts by M.C.M.J. to get custody of Child AA. The Georgia court ruled that the custody issue was pending before the Chancery Court of Warren County, Mississippi and ordered the sheriff of Wayne County, Georgia to transport Child AA back to Mississippi.
¶ 6. By an agreed order, entered on September 15, 1995, temporary custody of Child AA was placed in the foster care of Mr. and Mrs. John Moorehead. Child AA’s custody ' was changed on November 8,1995, from Mr. and Mrs. Moorehead to Mr. and Mrs. Abe Neal Fowler, Jr.
¶7. The parties produced numerous witnesses who testified as to the other’s drug use. C.E.J. admitted to smoking marijuana and occasional experiences with cocaine, but he denied having done drugs in front of the children. M.C.M.J. admitted that she had experimented with various drugs, including marijuana, powder cocaine, and crack cocaine. Witnesses testified before the chancellor as to the parenting skills of both C.E.J. and M.C.M.J. As with most custody hearings, the testimony among the witnesses was conflicting as to which party was the best parent and the primary care-giver of the children.
¶8. The testimony revealed that C.E.J. worked during the day and came home at night to take care of the children. M.C.M.J. cared for the children during the day, but left the home at night either to work or go out with friends. M.C.M.J. called herself a "night person” and attempted to find employment that fit her schedule. The testimony also indicated that M.C.M.J. took the children with her on more than one occasion to buy drugs and meet various men to have sex in exchange for money.
¶ 9. After hearing all the evidence presented, the chancellor issued her ruling on September 23, 1996, granting C.M.J. a divorce from M.C.M.J. based on the grounds of cruel and inhumane treatment, with custody of Child AA awarded to C.E.J., and no alimony granted to M.C.M.J. The decree of divorce was entered on October 6, 1996, wherein the chancellor enumerated a lengthy and detailed visitation schedule. It is the custody award that M.C.M.J. now appeals to this Court.

*776
DISCUSSION OF THE ISSUE

I. THE COURT ERRED BY AWARDING C.M.J. CUSTODY OP CHILD AA.
¶ 10. The standard of review this Court invokes in a child custody case is well-settled. The review is “quite limited in that the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this court to reverse.” Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997) (citing Williams v. Williams, 656 So.2d 325, 330 (Miss.1995)). This Court will not disturb the findings of a chancellor, “be they of ultimate fact or of evidentiary fact,” when supported by substantial evidence in the record. Smith v. Jones, 654 So.2d 480, 485 (Miss.1995) (quoting Cooper v. Crabb, 587 So.2d 236, 239 (Miss.1991)).
¶ 11. “In all child custody cases, the polestar consideration is the best interest of the child.” Sellers v. Sellers, 638 So.2d 481, 485 (Miss.1994). There are a number of factors that should be considered by chancellors in weighing decisions regarding custody:
The age of the child is ... but one factor to be considered; Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors- relevant to the parent-child relationship.
Id. (quoting Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983)).
¶ 12. The lower court issued a forty-page opinion in the case sub judice, of which ten pages were devoted to the issue of custody of Child AA. The chancellor addressed and analyzed each of the Albright factors before determining that it was in the best interest of Child AA to be placed in the custody of her father, C.E.J.
¶ 13. The chancellor noted that the child was six years old, which did not prohibit placing her in the custody of either parent. There was very little testimonial or documentary evidence to suggest the health of the child favored either parent. While the evidence indicated M.C.M.J. cared for the children while C.E.J. was at work, C.E.J. played a major role in Child AA’s overall care. The chancellor noted her concern with the quality of M.C.M.J.’s care for Child AA based on the evidence presented at trial. Although the chancellor did not specifically find that one parent had better parenting skills than the other, it is apparent from the record and the lower court ruling that the chancellor questioned M.C.M.J.’s parenting skills.
¶ 14. C.E.J. had steady employment, but it commanded a great deal of his time. However, the evidence shows that he is willing to place Child AA’s best interests ahead of his work. M.C.M.J.’s employment afforded her a more flexible schedule, but she worked sporadically. The chancellor found that both parties were young and in good health, although both admitted to drug use. Both parties were found by the lower court to be emotionally attached to Child AA.
¶ 15. Moral turpitude was alleged by both parties and proven to some extent according to the ruling of the chancellor. However, this Court has said this could not be the sole basis for a custody decision. Albright, 437 So.2d at 1005. The chancellor did not base her decision solely on the lifestyle of either parent.
¶ 16. The chancellor made Iéngthy findings as to the home, school, and community record of Child AA. The chancellor stated that Child AA desperately needs as much stability as possible in her life. In the opinion of the lower court, Child AA had been moved too many times over the course of C.E.J.’s and M.C.M.J.’s relationship. Neither C.E.J. nor M.C.M.J. owned a home, but each intended to live with their respective parents if awarded custody in order to provide as stable a *777 home environment as possible. The chancellor discussed each of the potential living arrangements and the resulting benefits to Child AA. Lastly, the chancellor discussed the employment of each parent and the prospective plans of each regarding employment should custody be granted to that parent.
¶ 17. The lower court also considered the effect of separating Child AA from her older half-sister, Child BB. The chancellor noted that normally it is not in the best interest of the children to be separated. However, the circumstances presented to the chancellor in the case sub judice dictated, in the chancellor’s opinion, that it was in the best interests of Child AA to be separated from her half-sister. This Court has held:
We have no such general rule regarding the separation of sibling children. We stated in Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss.1983):
This Court has never adopted any per se rule to the effect that children should not be separated, in the absence of a showing of absolute necessity for the child’s welfare
[[Image here]]
We did state, however, in Mixon v. Bullard, 217 So.2d 28 (Miss.1968) albeit by dicta:
The Court shall in all cases attempt insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister at the ages of these children is important in the lives of both of them and to deprive them of the association ordinarily would not be in their best interests. 217 So.2d at 30-31.
This expresses a common sense recognition of the ordinary facts of life that in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of children to be separated.
Sellers, 638 So.2d at 485 (quoting Sparkman, 441 So.2d at 1362).
¶ 18. M.C.M.J. argues that the chancellor gave no reason for her decision to place custody of Child AA with C.E.J.
“ ‘[T]he chancellor is the judge of the weight and worth of the testimony in a divorce proceeding.’” Magee v. Magee, 661 So.2d 1117, 1125 (Miss.1995) (quoting Dubois v. Dubois, 275 So.2d 100, 101 (Miss.1973)). See also Rainey v. Rainey, 205 So.2d 514 (Miss. 1967). The chancellor heard the testimony and viewed the evidence presented prior to making her decision to award custody of Child AA to C.E.J. This Court has written before regarding the importance of chancellor’s ability to view the witnesses firsthand and the deference given to such opportunity.
¶ 19. We wrote in Culbreath v. Johnson:
The trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable.
Madden v. Rhodes, 626 So.2d 608, 625 (Miss. 1993) (quoting Culbreath v. Johnson, 427 So.2d 705, 708 (Miss.1983)).
¶ 20. The chancellor’s decision is supported by the evidence contained in the record. Although no specific reason is stated in the chancellor’s opinion as to why custody was awarded to C.E.J. instead of M.C.M.J., this Court should not disturb the chancellor’s findings when supported by substantial evidence in the record. Smith, 654 So.2d at 485. There is no evidence that the chancellor abused her discretion or applied an erroneous legal standard. Wright, 700 So.2d at 280.

CONCLUSION

¶21. The chancellor correctly applied the Albright factors to the facts in the case sub judice. The Court gives great deference to the chancellor’s opportunity to view the witnesses and their demeanor. The chancellor did not state a specific reason as to why she awarded custody of Child AA to her father, C.E.J., but the record clearly supports such *778 award. There was no abuse of discretion on the part of the chancellor and her findings should not be disturbed on appeal.
¶22. For the aforementioned reasons the decision of the lower court to award custody of Child AA to C.E.J. is affirmed.
¶ 23. JUDGMENT IS AFFIRMED.
PRATHER, C.J., SULLIVAN and PITTMAN, P.JJ., and BANKS, MeRAE, SMITH, MILLS and WALLER, JJ., concur.

. The parties were given assumed names in order to protect the privacy and innocence of the children.