737 So.2d 1022 (1998)
Leon SOOTIN, Appellant,
v.
Karen SOOTIN, Appellee.
No. 97-CA-00957 COA.
Court of Appeals of Mississippi.
December 30, 1998.
Rehearing Denied March 9, 1999.
Darnell L. Nicovich Walter W. Teel, Gulfport, Attorneys for Appellant.
Damon Scott Gibson, Herbert J. Stelly, Gulfport, Attorneys for Appellee.
Before THOMAS, P.J., and COLEMAN and HINKEBEIN, JJ.
*1023 HINKEBEIN, J., for the Court:
¶ 1. The Chancery Court of Harrison County granted Leon Sootin (Leon) a divorce from Karen Sootin (Karen) on the grounds of her adultery. The chancellor initially granted custody of the couple's two daughters to Leon and ordered Karen to pay $240 per month in child support. While denying Karen's request for lump sum alimony, the chancellor awarded her periodic alimony of $750 per month, thirty percent of Leon's 401K retirement plan, and $4500 in attorney fees. Pursuant to a motion to reconsider by Karen's attorney, the chancellor amended his earlier findings and opinion and granted Karen custody of the younger daughter and ordered Leon to pay $500 per month in child support. Aggrieved by the chancellor's decision, Leon raises the following assignments of error:
I. THE CHANCERY COURT ERRED IN AMENDING ITS FINDINGS, CONCLUSIONS, AND OPINION WITHOUT EXPLANATION, AND IN ENTERING ITS JUDGMENT WITHOUT HEARINGS ON PENDING MOTIONS TO REOPEN TESTIMONY AND TO RECONSIDER.
II. THE CHANCERY COURT ERRED IN AWARDING PERIODIC ALIMONY TO KAREN SOOTIN.
III. THE CHANCERY COURT ERRED IN AWARDING CUSTODY OF ARYN SOOTIN TO KAREN SOOTIN.
IV. THE CHANCERY COURT ERRED IN REFUSING TO ALLOW THE TESTIMONY OF DR. VIRGINIA DEROMA.
V. THE CHANCERY COURT ERRED IN NEGLECTING TO ADDRESS THE PAYMENT OF DEBTS, OR THE DISTRIBUTION OF ASSETS IN ITS RULING, AND IN AWARDING KAREN SOOTIN THIRTY PERCENT OF LEON SOOTIN'S 401K.
VI. THE CHANCERY COURT ERRED IN AWARDING KAREN SOOTIN ATTORNEY'S FEES IN THE SUM OF $4,500.
¶ 2. Finding merit to Leon's third assignment of error regarding custody, we reverse and remand for findings consistent with this opinion.

FACTS
¶ 3. Leon and Karen were married on April 15, 1985. It was Leon's first marriage and Karen's third. The couple eventually bought a house in Long Beach, Mississippi where they lived together until their separation in January of 1996. Their oldest daughter, Hallie, was born December 20, 1985, and their youngest daughter, Aryn, was born May 20, 1987. As of the time of this appeal, Hallie is twelve years old, and Aryn is eleven years old. Leon was employed by Lanier Worldwide and was a district manager at the time of trial. Karen had her own wallpaper hanging business and also operated a wallpaper store owned by the couple.
¶ 4. The record reflects that this was a troubled marriage from its inception, with each party assigning the blame to different factors. Leon cited Karen's financial irresponsibility and her reckless spending. He testified that she would secretly withdraw money from the couple's bank and investment accounts and would routinely bounce checks and conceal credit card purchases. He recounted receiving calls at work from collection agencies and credit card companies complaining that bills had not been paid, even though he had given Karen the money to pay them. He claimed this pattern was not confined to their home life. He testified that Karen withdrew thousands of dollars from the accounts of the family wallpaper store and would not pay business creditors. Leon also contended that Karen's failure to maintain business records caused tax problems. Karen contended that Leon was a cold and distant husband, who demeaned her and failed to show her love and affection. She claimed that in their entire eleven year marriage they had sexual relations *1024 on only nine occasions. She also accused Leon of constantly yelling at his two daughters and taking no part in their lives. The record reveals that the couple had sought marriage counseling on a number of occasions.
¶ 5. The situation came to a head on Christmas of 1995 when the couple discussed divorce, and by agreement, Leon moved out of the family home on January 1, 1996. At some point during the separation, Karen began dating and engaging in sexual relations with Tim Glendenning, who lived across the street. Glendenning was married but his wife was confined to a mental institution in California. Karen testified at trial that she and Glendenning intend to get married. Glendenning also had a young daughter named Brittany. Karen's relationship with Glendenning was apparently a great source of anger to her oldest daughter. Hallie reportedly felt her mother was spending all her time with her boyfriend and his daughter. The relationship between mother and daughter deteriorated to the point where Karen reportedly told Leon she was sick of it, and Hallie was left to live at her father's apartment. The younger daughter, Aryn, continued to live with Karen. The record reveals that during the separation Karen blocked efforts by Leon to visit Aryn.
¶ 6. Karen filed for divorce on September 27, 1996 on the grounds of habitual cruel and inhuman treatment, or in the alternative, irreconcilable differences. In her complaint, Karen sought custody of both children. Leon's answer denied the essential allegations of the complaint, and in a counterclaim, sought a divorce from Karen on the grounds of habitual cruel and inhuman treatment, or in the alternative, irreconcilable differences, or in the alternative, adultery. Leon also sought custody of both children.
¶ 7. The case went to trial on March 13, 1997 in the Chancery Court of Harrison County. In her testimony, Karen painted a picture of Leon as a moody and frequently angry husband who denied her and the children affection. Friends of Karen who testified essentially supported Karen's characterization of Leon, but had little actual knowledge of Leon's interaction with his children. Her friends described Karen as a good mother. During cross-examination, Karen admitted to beginning a sexual relationship with Tim Glendenning during her separation from Leon. She denied she had ever been physically abusive to her nineteen-year-old daughter from a previous marriage. However, she later admitted that the police were once called to her home after she struck the nineteen-year-old daughter across the face while Hallie and Aryn were present. She also conceded that she would direct curse words at her husband in the presence of the two children. When questioned about Leon's alleged lack of affection, Karen admitted that he had taken her on vacation trips to France, Italy, Switzerland, and Bermuda and had purchased her expensive gifts. She also claimed that evidence showing Leon as an involved and affectionate father was contrived for the purpose of the divorce and intended to sway the children against her. She characterized her daughter Hallie as a difficult child whose extreme anger at her was the result of brainwashing by Leon. She defended her refusal to allow Leon to visit Aryn by stating her belief that the young girl was not well cared for when she stayed with her father. On cross-examination, Karen also indicated her intention to file bankruptcy as to the wallpaper store.
¶ 8. Leon testified as to his active involvement in his children's school and church activities. Specifically, he was the president of the parent-teacher association at his daughters' parochial school and had been involved in fund-raising efforts at the school for a number of years. He also took the children to church regularly. Friends of Leon testified that he was an affectionate and dedicated father who interacted well with his children and regularly attended his daughters' sporting events. Despite the strain caused by Karen's *1025 alleged financial irresponsibility, Leon testified that he bought the wallpaper business in an effort to make Karen happy. He testified that the financial difficulties were exacerbated by Karen's operation of the store, her irregular hours, and her refusal to turn over business records to the couple's accountant. He stated his concern with Mr. Glendenning staying overnight with Karen and the effect it was having on his children. He recounted one incident early in the separation where his daughters called him in an excited state at approximately three o'clock in the morning. He testified finding the girls locked in their bedrooms. He testified that he subsequently discovered an intoxicated Karen and Glendenning swimming in the pool. The degree of clothing worn by the swimming couple is a matter of factual dispute. Leon also expressed concern over Glendenning smoking in the presence of Hallie due to his daughter's asthma. He testified that once Hallie began living with him, her falling grades at school improved dramatically. He also noted that he was regularly taking both children to clinical psychologist Virginia DeRoma for counseling, and that Dr. DeRoma had also seen Karen on one occasion. While Leon sought to introduce the testimony of Dr. DeRoma, the chancellor disallowed the testimony on the grounds of medical privilege.
¶ 9. Prior to trial, the court appointed clinical psychologist Michelle Delehant, Ph.D. to evaluate both parties and their children and ordered that both parties make themselves available for diagnostic testing. Karen sought to block Dr. Delehant's testimony on the basis that it was a privileged communication. However, the chancellor allowed the testimony on the basis that Karen had placed in issue her qualifications as a parent deserving of primary custody. Dr. Delehant outlined the standard psychological tests she administered to the entire family. She testified that Leon appeared to have a close bond with both his children and that they both displayed affection toward their father. She recounted Hallie's anger at her mother over the amount of time Karen spent with Mr. Glendenning and his daughter, and with Karen reportedly throwing her out of the house. Dr. Delehant described Aryn as generally upset over the entire custody dispute. She found that while there was no evidence that Leon had influenced his children against their mother, there was evidence that Karen had sought to influence Aryn against her father. She did state that Aryn had a slightly closer relationship with her mother than with her father. There was also testimony that Karen was considering taking Aryn out of the school where Hallie attended classes. Dr. Delehant concluded her testimony with her assessment of Leon as a good parent and recommended that Hallie and Aryn be kept together and that they live with their father. She did not characterize Karen as being an unfit parent.
¶ 10. Testimony concluded March 17, 1997. Prior to the chancellor's issuance of his findings and order, Leon filed a motion with the court to reopen testimony. He sought to introduce evidence that Karen and Aryn had moved in with Mr. Glendenning and that Karen had filed bankruptcy and abandoned the business property, leaving Leon solely responsible for all indebtedness. He also wanted Dr. DeRoma to be allowed to testify as to her concerns over Hallie and Aryn's welfare. In light of Karen's bankruptcy, he requested that Karen not be awarded any portion of Leon's 401K retirement account. The record shows that no hearing was ever held on Leon's motion. On June 2, 1997, the chancellor issued his findings and opinion. He found that Leon had refuted Karen's claims of habitual cruel and inhuman treatment and granted Leon a divorce on the basis of Karen's adultery. Relying heavily on the testimony of Dr. Delehant, the chancellor awarded primary custody of both girls to Leon. Karen was to be allowed regular visitation and was required to pay child support. He ordered the family home and business sold and the *1026 proceeds divided after the payment of all outstanding debt. He also ordered that Karen receive $750 per month in periodic alimony and thirty percent of Leon's 401K retirement account. The court also awarded Karen $4500 in attorney fees.
¶ 11. On June 11, 1997, Karen's attorney filed a motion to reconsider with the court. The motion alleged that, in a conference not contained in the record, the chancellor advised counsel that he had already decided to give custody of Hallie to Leon and award custody of Aryn to Karen. The motion claimed that on the basis of this belief, Karen had offered no further evidence as to custody. Four days later, the chancellor issued an amended set of findings as well as an amended order. The findings were essentially the same, except that in relying on Dr. Delehant's testimony, the chancellor now ordered that the two sisters be separated, with Aryn remaining with her mother. Leon was ordered to pay Karen $500 per month in child support. From the second amended order, Leon perfects his appeal to this Court.

DISCUSSION

III. THE CHANCERY COURT ERRED IN AWARDING CUSTODY OF ARYN SOOTIN TO KAREN SOOTIN.
¶ 12. Leon argues that the chancellor's decision to separate Hallie and Aryn was not in the best interest of the children and constituted reversible error. He also notes that the chancellor's amended findings fail to give any unusual or compelling circumstance that would justify the separation. Karen asserts that the chancellor considered the appropriate factors in determining custody and his decision is supported by substantial evidence. We disagree and reverse and remand for findings consistent with this opinion.
¶ 13. The standard of review invoked for child custody cases is well-established. This Court's review is "quite limited in that the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this court to reverse." M.C.M.J. v. C.E.J., 715 So.2d 774(¶ 10) (Miss.1998) (quoting Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997)). "On appeal this Court will not reverse a Chancery Court's findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence supporting those findings." Cooper v. Crabb, 587 So.2d 236, 239 (Miss.1991). Even where the specific basis of a decision is not stated in the chancellor's opinion, the decision will not be disturbed if substantial evidence can be found in the record. M.C.M.J, 715 So.2d at 777 (¶ 20).
¶ 14. Amid the finger-pointing and acrimony of divorce, it is usually the children who find themselves blameless victims on the marital battlefield. The case sub judice is no exception. The issue before this Court is to determine whether the chancellor's decision to separate Hallie and Aryn was manifest error. "There is no per se rule against the separation of children." Bowen v. Bowen, 688 So.2d 1374, 1380 (Miss.1997). Rather, as "[i]n all child custody cases, the polestar consideration is the best interest of the child." Sellers v. Sellers, 638 So.2d 481, 485 (Miss.1994). However, the Mississippi Supreme Court has held that "in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of children to be separated." Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994) (quoting Sparkman v. Sparkman, 441 So.2d 1361, 1363 (Miss.1983)). Much of Mississippi's case law on this issue takes guidance from the admonition given by the court thirty years ago:
The Court shall in all cases attempt insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister at the ages of these children is important in the lives of both of them and to deprive them of the *1027 association ordinarily would not be in their best interests.
Mixon v. Bullard, 217 So.2d 28, 30-31 (Miss.1968). The Mississippi Supreme Court has enumerated a non-exclusive number of factors to be considered by chancellors when making custody determinations. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). The Albright factors are as follows:
Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Id.
¶ 15. In our review of the record, we take note that in both the original and the later amended findings and opinion, the chancellor acknowledges his application of the Albright factors and the recommendations of Dr. Delehant. What raises concern is that in the original findings, the result echoed Dr. Delehant's exhortation that both children live with Leon, since the chancellor found no controlling reason to separate the sisters. In the amended findings, again referring to the Albright factors and Dr. Delehant's advice, the chancellor gave custody of Aryn to Karen, referencing the girl's close relationship with her mother. Our review of the record indicates that Aryn's affection toward her mother was only slightly more than she felt toward her father. The testimony of Dr. Delehant regarding Karen's active efforts to sway Aryn against her father does much to mitigate the significance of this particular Albright factor. As such, this Court can find no "unusual and compelling circumstance" in the chancellor's amended findings that would require Hallie and Aryn to be separated in order to serve their best interests. Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994). In cases where the court has affirmed decisions separating siblings, the circumstances were often of some magnitude. In Bowen v. Bowen, 688 So.2d 1374, 1381-82 (Miss.1997), the court affirmed a chancellor's decision to award custody of a fifteen-year-old boy to his mother, while giving custody of the boy's eleven-year-old brother to his father. The chancellor found that the mother's apparent lesbian relationship had subjected the younger child to continued cruel and hurtful taunts from other children in the small community. Id. As such, he reasoned it would be better for the boy to live with his father. Id. In Carson v. Natchez Children's Home, 580 So.2d 1248 (Miss.1991), the court affirmed the separation of a six-year-old sister and her seven-year-old brother as part of a parental termination action. As the result of being sexually abused by both their mother and other adults, the brother and sister would engage in sexual behavior with each other. Id. at 1250. The chancellor found that the children would have a greater chance of success in therapy if they were to live in separate foster homes. Id. at 1257. In the case sub judice, the record reflects no compelling circumstance which would justify the separation of Hallie and Aryn. The only instance of conflict or discord between the girls was a spat at school during their parent's separation. Leon makes much of the fact that the chancellor's amended finding gave no specific basis for the split custody. As we have stated, that is insufficient to justify reversing a chancellor's decision. M.C.M.J, 715 So.2d at 777 (¶ 20). However, when the record itself contains no substantial evidence to account for the ruling, *1028 as we find in the case sub judice, we are compelled to reverse and remand to the chancellor for findings that would justify the separation of the two children.
¶ 16. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED EXCEPT AS TO THE ISSUE OF CUSTODY OF ARYN SOOTIN WHICH WE REVERSE AND REMAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HERRING, KING, PAYNE and SOUTHWICK, JJ., concur.