# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00095-COA

ANGELA LAMBES

APPELLANT

v.

ERIC LAMBES

APPELLEE

DATE OF JUDGMENT:                12/18/2019
TRIAL JUDGE:                     HON. MARK ANTHONY MAPLES
COURT FROM WHICH APPEALED:       JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          JULIET LAWSON JOWETT
ATTORNEY FOR APPELLEE:           G. CHARLES BORDIS IV
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 02/15/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., GREENLEE AND SMITH, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     After almost three years of marriage, Eric and Angela Lambes filed competing claims for divorce based on habitual cruel and inhuman treatment or, alternatively, irreconcilable differences. The couple had two minor children born of the marriage. The Jackson County Chancery Court initially awarded temporary physical custody of the children to Angela. After a hearing in 2017, the court modified the temporary custody order, allowing each parent to have the children on a rotating week-on/week-off basis. In November 2018, the court granted Eric temporary physical custody of the children, with Angela to receive visitation. This ruling was in accordance with the recommendation by the guardian ad litem (GAL) assigned to the proceedings.

¶2. After contentious litigation spanning almost five years, the chancery court bifurcated the trial and granted Angela a divorce on the ground of habitual cruel and inhuman treatment on May 23, 2019. Between June 2019 and October 2019, a trial was held on the remaining issues of child custody and support. In the final judgment, the chancery court awarded Eric sole physical custody of the children, with Angela to receive liberal visitation.

¶3. Angela appeals from the judgment, arguing that (1) the chancery court's custody ruling was not supported by credible evidence, (2) Eric should not have been granted sole physical custody of the children due to his confessed habitual cruel and inhuman treatment toward Angela, and (3) the GAL made material misrepresentations in her report.[1] Finding no error, we affirm the chancery court's judgment.

**FACTS AND PROCEDURAL HISTORY**

¶4. Eric and Angela were married on December 31, 2011.[2] Two children were born of the marriage: "Adam" was born in 2012, and "James" was born in 2014.[3] The couple's relationship was turbulent, and they separated on or about August 3, 2014, after Eric allegedly assaulted Angela. On August 6, 2014, the Jackson County Justice Court issued

---

[1] Angela's additional assignment of error regarding Eric's alleged failure to seek medical or dental care for the children will be addressed with the relevant *Albright* factor in Part I.

[2] The chancery court's final judgment states the couple married on January 31, 2011, but the record testimony indicates that the couple did not marry until December 31, 2011. For the purposes of appeal, however, the date of marriage is irrelevant.

[3] Pseudonyms are used to protect the children's identities.

Angela an "Ex Parte Emergency Domestic Abuse Protection Order" against Eric. The order noted that a hearing was to be held on August 18. By the hearing date, Eric had retained counsel, and the court continued the hearing until August 25, by which time Angela had retained counsel for herself. Angela's counsel allegedly advised her not to press charges, and the chancery court dismissed her petition for a protective order without prejudice on August 25, 2014, "on motion of the Petitioner[.]"

¶5.     On August 22, 2014, Eric filed a complaint for divorce on the ground of habitual cruel and inhuman treatment or, alternatively, irreconcilable differences. In his complaint, Eric requested "the sole care, custody and control of the minor children." Angela answered the complaint and asserted a counterclaim, seeking a divorce on the ground of habitual cruel and inhuman treatment or, alternatively, irreconcilable differences. The counterclaim alleged that Eric had exhibited violent behavior—e.g., choking Angela when she was pregnant, striking her "with a closed fist," pinning her down on the sofa while she was holding James, punching walls and doors, and threatening physical harm to her and her family in the children's presence. Some of these alleged incidents were documented in a Jackson County Sheriff's Report dated August 5, which was attached as an exhibit to her counterclaim. Angela also sought "primary physical[] care, custody and control of the minor children."

¶6.     Between 2014 and 2016, the chancery court granted numerous continuances, and Angela obtained new counsel in 2015. On August 19, 2016, the chancery court appointed Lauren Sonnier as the GAL. The court entered a temporary order on October 21, 2016,

awarding joint legal custody of the children to both parents and sole physical custody to Angela, with Eric being allowed visitation as agreed upon by the parties. Trial was set for February 10, 2017.

### GAL Report – January 27, 2017

¶7. The GAL filed her initial report with the chancery court on January 27, 2017. Angela reported to the GAL that Eric had "punched walls and doors in [Angela's] mother's house" and had "kicked her out of the house a couple of times while she was pregnant with [James]." The GAL further noted Angela's concern when the children are with Eric, claiming they came "back far more aggressive" after staying with him and had "scratches on their face[s]." The GAL, however, found that the children were "healthy with no medical concerns," attending daycare, and "appear to be happy, average little boys in play and appearance." It was also noted that Adam "sees a therapist."

¶8. Eric was unaware the boys were seeing a counselor. Eric was "requesting full custody because he and Angela cannot communicate amicably and she called DHS on 'them' and that makes him question her mental health." The GAL further reported that "[Eric] says [Angela] has snapped on him and there is nothing to stop that," and he is concerned she is "bi-polar." The GAL felt that "a lot of the resentment is based on the DHS claims."

¶9. The GAL interviewed Michelle Allen, the children's counselor. Allen stated that the children did not make negative comments about their father. She did note a scratch on one of the children's legs but found nothing unusual about it. Although Adam had claimed Eric

4

locked him outside one night, Allen said Adam did not seem fearful of Eric. Allen expressed concern about comments made by Angela's mother, Debra Skinner, about Eric's mother. While Allen agreed that Eric had treated Angela badly, she did "not know of a legal reason why Dad should not be involved in the children's life." She further noted that while she was treating Adam, he began acting more "violently."

¶10.    The GAL also interviewed Debra, who provided the GAL with a notebook she had compiled. This notebook contained photos of the children, "a chronology entitled 'abuse history,' a copy of a 2014 sheriff's report of assault" and the domestic abuse order, "pictures of holes punched in doors/walls, text messages detailing concerns over Eric's behavior, . . . descriptions of boys' behavior after visits with father, [and] multiple pages on dealing with a narcissist." We note that the court's record also contains an email that Debra sent the GAL on January 27, 2017, asserting that Adam had two incidents of bowel incontinence and had "cried continuously" after visitation with Eric and his parents. She alleged in the email, "I suspect highly sexual abuse due to timing. I would not accuse intentionally or falsely but I really suspect malice." Adam's medical records, however, indicate that he was only seen by his pediatrician during this time period for a respiratory illness and flu symptoms.

¶11.    Finding three of the *Albright* factors[4] favored Angela, the GAL recommended that physical custody remain with Angela, with Eric to receive "reasonable visitation." She also felt that the parties should communicate "without grandparent involvement."

---

[4] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

## February 10, 2017 Hearing

¶12.    During preliminary discussions at a February 2017 hearing, Angela accused Eric of abusing the children. When pressed by the chancellor for specific instances of abuse, however, Angela merely insisted that the children were "being brainwashed" and were "scared to go" to Eric's house. Eric's attorney informed the court that there was a pending motion for Angela to submit to a mental evaluation because there had been some concern "about her mental state." A letter from Eric's attorney sent to Angela's former attorney was entered into evidence, which stated that Angela had visited Eric at his place of employment on September 9, 2014, "distraught and crying." The letter further alleged she "began loudly discussing the divorce" while holding Adam and was asked to leave by management. She continued to "caus[e] a scene" in the parking lot.

¶13.    Eric expressed "significant concern[]" about Angela's mental health in his testimony, recounting an instance where she threw "a fit" in the car and began punching and yelling for him to let her out. This behavior was in response to a comment Eric made that she should "self-evalu[ate]" why she had issues with other women in their church. He also testified that Angela was upset on another occasion and called his mother a "f-ing bitch . . . a whore, things of that nature." Eric acknowledged that he and Angela "had many physical altercations," but claimed he was simply defending himself. Eric said their attempt at marriage counseling was unsuccessful.

¶14.    Robert Lambes, Eric's father and a retired schoolteacher, testified that Angela and

6

Eric had lived with him and his wife for a period of time. After an incident where Angela allegedly called his wife names and threw a set of keys at his head, he asked the couple to move out. Like Eric, Robert expressed concern for Angela's mental stability. He noted that on one occasion when he and his wife brought the children home, Angela went "into a rage" and hit his wife with a shirt, knocking off her glasses. Robert also averred that Angela and her mother had "an unnatural hatred for my wife." Robert did acknowledge that Angela "loves those kids and she wants to nurture them to the best of her ability."

¶15. Angela testified that she had to take the children to the doctor constantly, specifically noting that after one week with Eric, one of the boys had impetigo. She said the children were enrolled at preschool, and she was currently attending nursing school. She denied being diagnosed with a mental illness. Angela accused Eric of having smoked marijuana, and she testified that there had been several incidents of domestic violence between the couple (e.g., Eric's pushing her down or twisting her arms, threatening to kill her friend's unborn child, and threatening to burn down her mother's house). Angela requested the chancery court award her sole physical custody, with Eric to receive visitation every other weekend. On cross-examination, Angela said she had to wear a heart monitor for a while because she "had developed a lot of stress and anxiety." After the initial incident in August 2014 that resulted in the protective order, she claimed that she stayed at a shelter for four days. Angela admitted that she briefly reconciled with Eric afterward. She also testified that she had seen a psychologist years ago "for [her] own self help, self-esteem," before her marriage with

7

Eric. Angela denied hitting Eric's mother or calling her names.

¶16. Debra testified that Eric had knocked holes in the walls of her house when the couple lived with her and that he was "abusive." She also accused Eric and his parents of "trying to keep these kids sick" by not giving them their medications and asserted, "They're going to hurt these kids more and they're going to brainwash them more."

¶17. Finally, the GAL testified that the other witnesses' testimony gave her "additional concerns" that Angela's having sole physical custody would "damage the relationship between the children and their father." She specifically noted Angela's "lack of communication with [Eric], failing to include him within the counseling and the medical records, continually bringing up allegations from the past three years, and raising consistent concerns and allegations of abuse from minor scratches and rough play by two young boys." The GAL reserved making any recommendation regarding custody "until there can be a psychological evaluation [of Angela and Debra] performed."

¶18. The chancery court observed that the parties had agreed to a divorce on irreconcilable differences and had consented to adjudication of child custody, visitation, and support. The chancery court amended the temporary order on March 17, 2017, nunc pro tunc to February 10, 2017, modifying temporary physical custody to both parents being awarded one week-on/one week-off. The court ordered Eric and Angela to take co-parenting classes and to submit to psychological testing. The court also requested that the GAL enter another report once the parties had completed their evaluations.

8

**August 2017 – December 2017**

¶19. On August 16, 2017, Eric filed a motion for custody or, in the alternative, injunctive relief, seeking sole physical custody because of Angela's failure to enroll Adam in kindergarten. The chancery court entered an order on December 7, 2017, ordering the GAL to coordinate a forensic interview with the children based on new allegations by Angela's mother that Eric's parents had assaulted one of the children. According to the court's record, Debra had reported to the Gautier Police Department, on December 1, 2017, that James told her that Lambes had "punched [him] in the wee wee and it hurt[]." This allegation was never substantiated, and no charges were filed.

**March 2018 – November 2018**

¶20. On March 18, 2018, Angela filed a withdrawal of her consent to divorce on the ground of irreconcilable differences and a withdrawal of her consent to adjudicate the issues of child custody, visitation, and support. She subsequently filed a motion for modification of custody on April 5, 2018, seeking sole physical and legal custody of the children. Angela alleged that since the change in custody to the rotating week-on/week-off basis, the children had (1) "experienced physical and emotional changes which [were] detrimental to them"; (2) "exhibited increased anger issues and disruptive inappropriate behavior"; and (3) had experienced medical issues (i.e., skin rashes and excessive weight gain). She further alleged that Eric had refused to co-parent with her or to take the children to counseling sessions. Angela also claimed Eric had been "degrading and combative" toward her.

¶21.    A motions hearing was held on July 3, 2018.  Angela was represented by a new attorney.  Both parties requested a modification of custody, asserting that the "week-on/week-off" custody schedule was not working.  Angela said that Adam had gained thirty pounds in the last eighteen months and had to see a gastroenterologist for bowel incontinence.  She also noted that James had a rash and a scalp fungal issue.  Based on the GAL's recommendation, the chancery court did not modify custody and ordered Eric and Angela to meet with Dr. Darlys Alford to work on their co-parenting issues.  The court also ordered the parties to meet with the children's pediatrician, Dr. Van Wurm, to address the children's ongoing medical issues.

¶22.    Angela later filed a motion seeking to remove or replace the GAL on November 5, 2018.  In the motion, she claimed the GAL (1) had only met with her once (in August 2016) for thirty minutes, (2) had not interviewed the children, (3) had not conducted a home visit since August 2016, (4) did not meet with Angela regarding her allegations in the motion for modification of custody, and (5) had shared the notebook Debra gave the GAL with Eric's counsel.

### GAL Report – November 9, 2018

¶23.    On November 9, 2018, the GAL entered a revised report in which she related that Dr. Alford had met with both parents and reported that Angela "seemed to suffer from PTSD and possible personality disorder" and that Eric had "admitted to past anger issues."  Dr. Alford's recommendation was that Eric "have primary custody," noting the children seemed "relaxed

10

in the father's company." The GAL also reported that Dr. Wurm had "no immediate health concerns for the children." With regard to Adam's weight gain, the doctor did not "feel it was a medical concern," noting that neither parent was a small person. Therefore, the GAL found "nothing of note in the medical records that [made] her believe the court need[ed] to take any actions as to the health concerns of the children." Because of Angela's motion to remove her as the GAL, Sonnier filed her report "without written recommendation in order to avoid any concerns of bias and removal pending the determination of the [c]ourt in this matter." On November 12, Angela moved to strike the GAL's report, alleging "factual and procedural inaccuracies." She also requested that the prior January 2017 report be stricken, because it was "contrary" to the GAL's testimony at the subsequent hearing.

## November 14, 2018 Hearing

¶24. A trial setting/motions hearing was held on November 14, 2018. In arguing against Angela's motion for a continuance, counsel for Eric noted that Angela's attorney had sent Dr. Wurm an email, and the doctor "now refuse[s] to see the child[.]" He also claimed that when the children were with Eric, Debra was going to their daycare and "harassing" the staff. Angela's attorney asserted that Dr. Wurm was contacted because James had made statements that he wanted to die. Dr. Wurm took issue with the specific language used by Angela and her attorney; so the attorney emailed him, seeking to take his deposition. Feeling it was unnecessary, Dr. Wurm decided not to treat the children any longer. With regard to whether the GAL gave Debra's notebook to Eric's counsel, counsel denied that he ever saw the

11

notebook. The GAL testified:

> I would ask the court . . . to hear my recommendation that the animosity with the mother against the father, and the continued concerns that have been unfounded by anyone that I have spoken to, or any concerns, would support that the child[ren] should remain more permanently in the father's home with visitation to the mother so as to end the constant litigation.
>
> . . . .
>
> I believe that the children should be in the father's custody. I don't think that this will end and that the stress that everyone that I have spoken to reports with the mother's care for the children will abate. It is a very stressful situation for her, based off of the reports that I have gotten from the people that I've communicated with, and that stress is continuing on for the children.

The chancery court granted Angela's motion for a continuance but denied all other pending motions. Moreover, the court awarded temporary physical custody to Eric, with Angela to receive visitation.

## May 23, 2019 Hearing

¶25. Both parties asserted that they wanted a divorce, and the chancellor[5] questioned the parties regarding the grounds for the divorce:

> I'm going to ask this question: Would either one of you agree that the divorce could be granted to the other of the ground of habitual cruel and inhuman treatment?
>
> If so, the divorce will be bifurcated, that issue addressed today. I see no reason why it couldn't or shouldn't be. All rights would be preserved that any party would have to any argument of equitable distribution or custody or anything else. And in my opinion in this case, because of the 1,735 days, it would

---

[5] Judge Michael Fondren retired from the bench in January 2019, and Judge Mark Maples became the presiding judge over the action.

adversely affect no one.

Eric's counsel responded, "We admit it. . . . [G]rant her a divorce on habitual cruel and inhuman treatment," and Eric agreed. The chancery court therein granted Angela's counterclaim and entered an order, incorporating its bench ruling and awarding her a divorce "on the statutory grounds of Habitual Cruel and Inhuman Treatment, pursuant to Section 93-5-1 of the Mississippi Code of 1972, as amended[.]" The court retained jurisdiction over the separate issues of child support and custody and granted Angela's motion to seal the record.

### GAL Report – June 4, 2019

¶26. On June 4, 2019, the GAL filed an updated thirty-eight-page report with the chancery court, recounting her previous findings and further noting that she had met with Angela on June 1, who "felt there were a lot of underlying issues that need[ed] to be addressed." Angela wanted the children to see a psychiatrist or psychologist based on a recommendation by the children's counselor, Megan Lockley.[6] Angela was also concerned about Adam's "behavioral issues" (i.e., hitting and throwing things). Angela noted that both children had said "they will kill themselves," and Adam says he is "stupid." Angela also was still concerned about Adam's weight gain. She claimed that Eric had been "mentally and physically abusive" to her, alleging that he had choked her and cut up her favorite bag with a knife. Angela further asserted that Eric had an "unhealthy relationship with his parents."

¶27. Of particular concern to Angela was "discrepancies" with regard to the children's

---

[6] Allen moved away; so the children began seeing Lockley for counseling.

dental care. Angela had taken the boys to a pediatric dentist, who had recommended treatment for cavities. The record indicates that Eric subsequently took the children to the dentist who employs Eric's mother, and he said that neither child had cavities. Eric did eventually take the children to the pediatric dentist but he did not want to get the treatment because he preferred to use the other doctor. Further, Adam had another doctor's appointment that conflicted with the dental appointment; so Eric did not get him examined at that time.

¶28. The GAL also interviewed several of the children's teachers, Dr. Wurm, and Lockley (who later testified before the court). Dr. Wurm told the GAL he had no health concerns for the children; particularly, he did not feel Adam's weight gain was a concern; so the GAL did not feel the court needed to take any action in that regard.

¶29. The GAL interviewed Adam, who said that his mother did not "fuss at Dad because Dad would hurt her." But he also told the GAL that "he has never seen Dad hurt mom but mom told him that Dad did. [Adam] says that he doesn't believe that because Dad is nice." Adam further related that Angela and her mother, "Nana," had talked badly about Eric in front of him, with Nana calling Eric "the 'f word and the b word.'" He also claimed that Nana told him that when he grows up, his "Dad will try to kill him," but he was not supposed to tell anyone she had said that. Adam told the GAL that Eric's mom called James "stupid" one time. He said Eric does spank them when they get in trouble, but Eric "never yells."

¶30. Addressing the *Albright* factors,[7] the GAL noted the "[p]resumption against custody to a violent parent," citing Mississippi Code Annotated section 93-5-24(9)(a)(i).[8] She nevertheless reasoned that even if Angela's past allegations of family violence were "accurate,"

> Dr. Alford's conclusion that the mother has a personality disorder, the father's completion of parenting class and ongoing sessions with Dr. Alford, compliance with all orders of the court and the lack of any violence during the pendency of this long standing litigation, rebut the presumption and *Albright* factors should be considered.

The GAL particularly expressed concern with Angela's "mental state," noting that while the mental evaluation "did not report any diagnosis," the report did state that she "may suffer from PTSD and she may attempt to control small details in an attempt to control her broader world." The GAL also reported that the allegations of abuse in the father's home were "unsubstantiated." The GAL recommended that sole physical custody be awarded to Eric, with Angela's current visitation schedule to remain in place.

### June 5-6, 2019 Trial

¶31. A trial was held on June 5-6, 2019. Angela's psychological evaluation conducted by

---

[7] The *Albright* factors are (1) the age, health, and sex of the child; (2) "continuity of care"; (3) "parenting skills"; (4) the parties' "willingness and capacity to provide primary child care"; (5) the parties' employment responsibilities; (6) the parties' "physical and mental health and age"; (7) the "emotional ties of parent and child"; (8) "moral fitness" of the parties; (9) "the home, school and community record of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each party; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Albright*, 437 So. 2d at 1005.

[8] We will discuss this statute and its applicability to this case in Part II.

15

Louann Claveau, a licensed professional counselor, was entered into evidence. Claveau noted that pictures of bruising on Angela had been provided to her, which "would lend support to the self report of violence committed against her." The evaluation indicated that Angela had "no identifiable mental issues" but it was also noted that she "most likely suffers from . . . Post-Traumatic Stress Syndrome." Claveau concluded in the report that Angela should not "be hindered from the care, custody and visitation with her children." Claveau also evaluated Eric and found him to be a "capable and dependable parent" in her report. She further found Eric "has no significant issues with anger" and "no potential for abuse or likelihood of development of the potential for child abuse." Both parties attended and completed co-parenting classes.

¶32. In response to the GAL's questioning at trial, Dr. Alford testified that she had met with Eric five times and with Angela four times.[9] When the boys came with their father to a session, they "seemed in good spirits and relaxed." When Angela brought the children, the eldest child was less participatory than before, and the youngest child was more active and "seemed to be sort of pressuring [Angela] to do what he wanted to do." Dr. Alford noted that Angela did not seem "comfortable being in my office." Although Angela "expressed very direct fear of even being in Mr. Lambes'[s] presence," Dr. Alford testified that Eric "seemed very controlled and calm whenever he was in the sessions with Angela or with the children."

---

[9] The chancery court overruled Angela's objection to tendering Dr. Alford as an expert witness, noting that the doctor had previously testified before the court as an expert witness in the fields of family counseling and custody recommendations.

Expressing concern that Angela's behavior "seems to be typical of someone who has a personality disorder," Dr. Alford recommended that sole physical custody be given to Eric.

¶33.   Eric testified that he had concerns about Angela's mental health, noting that her father was in a mental institution "for schizophrenia and manslaughter." He also averred that due to the contentiousness of the custody battle, which he blamed on Angela and her attorney, Dr. Wurm and the psychologist he had retained now refused to treat the children. Eric admitted "to habitual cruel[] and inhuman treatment, but not domestic violence." After Eric's direct examination, the trial had to be continued due to scheduling issues; so the court's current order remained in effect as to custody. The court admonished both parents not to interfere with one another's decisions and to make an effort to co-parent.

### October 22, 2019 (trial cont.)

¶34.   When the trial resumed, the first issue addressed was an email from Angela's attorney to the chancery court, the GAL, and Eric's attorney regarding photos that Angela had printed at Walmart per the attorney's request. The photos were of the children, including their arms, legs, and "bruising on the buttocks," as noted by the court. These photos prompted a Walmart employee to contact the local child protection service (CPS) and the police department. However, it was explained that the photos were not current (taken between 2016 and 2019) and that there had already been prior investigations and forensic interviews conducted regarding any abuse allegations. The GAL had spoken with the youth court and CPS with the understanding that they would let the chancery court handle all matters to avoid

17

any conflict.

¶35.   Direct examination of Eric continued.  Eric testified that when he and Angela took the children to their new pediatrician, Angela kept indicating "that the kids were still having bathroom issues," although he claimed they "very rarely" had bowel issues when staying with him.  So the doctor put the children on a treatment plan, which Eric claimed made the issues worse.   When they took the children back to the doctor, Angela apparently told the pediatrician about the custody issues in front of Adam, which Eric said "upset" the child.  Eric expressed concern that the stress of the litigation was adversely affecting the children's health.

¶36.   Eric was also worried about Adam's grades in school, noting that Adam had received an "F."   Eric immediately scheduled a conference with the teacher.  Eric testified that although the teacher simply said that Adam was not paying attention in class at times, Angela insisted that the teacher write down that the child was "losing concentration" and "getting dazed."  Eric felt he could not "co-parent" with Angela because "it just seems like basically everything I say is either she doesn't want to hear it or she doesn't understand it."

¶37.   Lockley, the children's counselor, testified as a fact witness that she began seeing both children in March 2017.   Lockley said that Adam's behavior was somewhat inconsistent—sometimes he would be "compliant"; other times he would be non-attentive and hyperactive.  She said that James was "usually very happy and go-lucky."  Lockley acknowledged that James had commented that he wanted to die, but she explained that young

children typically do not understand what that means. Lockley believed it was just "a statement of trying to express something that [James] needed to express but didn't know how." Lockley had given the parents a recommendation for a pediatric psychiatrist due to their medical issues and stress.

¶38. Lockley testified that both children had recently told her that they desired to spend equal time with their parents. She had approximately four conversations with the GAL and recalled telling her that the children seemed more emotionally attached to Angela, which was common in young children, and that they had trouble with the transition between the households. She felt that the inconsistencies between the households contributed to the boys' problems. Lockley further stated that having the mother's "emotional support" was "very important," but Lockley also noted that a "more kind of structured and a self-sufficient upbringing that a father typical[ly] brings is very important as well." Nothing in her interactions with Angela made her question the mother's mental stability. Lockley felt it would not be "appropriate" for her to give a recommendation for custody. On cross-examination, the counselor testified that Eric interacted with the children appropriately and was attentive to them during sessions. She said the only problems had been "the difficulty between the parents to be able to communicate effectively and kind of try to get on the same page about things."

¶39. Robert Lambes testified that Eric and the children still lived with him and his wife. He testified that he had been a schoolteacher for twenty-one years, taught social studies, and

coached track and football. Robert again recounted the incident in which Angela and Eric were fighting and Angela "called [Mrs. Lambes] names." Due to scheduling issues, the trial was continued until October 28.

**October 28-31, 2019 (trial cont.)**

¶40. Angela's attorney questioned Eric regarding the emergency domestic-abuse order that was entered, noting to the court that the evidence was relevant because "domestic abuse is a factor when considering custody of children"; so the chancellor afforded her "some latitude to explore" that issue. Eric said that when Angela had become upset during the car ride, as he had testified to in prior proceedings, the reason he refused to let her out was because he was embarrassed by her behavior. He also stated that he "had mentioned to [Angela] a few times that [he] was concerned about her mental health," recalling another instance when she was in the front yard beating herself over the head with a board. Eric admitted to punching holes in the walls of their home. Although acknowledging that the kids love their mother, Eric expressed concern that "the things that [Angela] and her mother say to those kids and the things they do to those kids are extremely harmful and detrimental."

¶41. Debra, Angela's mother, testified that she had been a psychiatric nurse for thirty-seven years. She stated that Eric had "busted a hole" in a door and had damaged a baby carriage and a side table. Although she never had witnessed Eric physically abuse Angela, she claimed that she had seen bruises on Angela's neck. Debra said Eric was "a bully," and she had "seen him be very controlling." She acknowledged that Angela's father, uncle, and

20

brother were all diagnosed with schizophrenia, but she denied ever seeing Angela commit self-harm.

¶42. On October 31, 2019, the court entered a temporary order addressing the Thanksgiving visitation schedule, but no changes were made regarding physical custody.

### December 18, 2019
### (Bench Ruling & Final Judgment)

¶43. On December 18, 2019, the chancery court issued its bench ruling. After discussing the applicable *Albright* factors and considering the totality of the evidence, the court awarded sole physical custody to Eric. In the final judgment, which incorporated the court's findings at trial, the chancery court concluded "that the best interest of the minor children would be served by awarding physical custody to Eric." The court awarded joint legal custody to both parents, and Angela was ordered to pay $481 in monthly child support payments.

## DISCUSSION

I. **Whether the chancery court's award of child custody was supported by substantial evidence.**

¶44. Angela's first assignment of error is that the chancery court "was manifestly wrong in ruling that the best interest and welfare of the children was to place them in [Eric's] custody." Our standard of review in child custody cases is limited. *Gossett v. Gossett*, 313 So. 3d 1063, 1069 (¶16) (Miss. Ct. App. 2021). "We reverse only if a chancellor is manifestly in error or has applied an erroneous legal standard." *Id.* (quoting *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶14) (Miss. 2001)). It is the chancery court's "sole responsibility to

21

determine the credibility of the witnesses and the weight of the evidence." *Id.* A chancery court's decision on custody matters will not be disturbed "unless it is clear that justice and the law require us to do so." *Id.*

¶45.   After addressing each applicable *Albright* factor[10] at trial, the chancery court ultimately concluded:

> In total consideration of the factors that have been considered by this court, the exhibits, the testimony, the investigations that have been done, the reports that have been entered, it is my opinion and it is the finding of this court that legal custody should be joint between the father and the mother, that the physical custody should remain with the father, that visitation should be afforded to [Angela].

Angela contends on appeal that all the *Albright* factors weighed in her favor; therefore, the chancery court's ruling was not supported by substantial, credible evidence.

### i.   Age, Health, and Sex of the Children

¶46.   The chancery court found this factor favored neither parent. At the time of trial, Adam was seven years old and in second grade; James was five and in kindergarten. The court noted that both children had been treated for bowel issues, with Adam's issues being more severe, requiring treatment by a pediatric gastroenterologist. The testimony showed that James had "atypical eczema."

¶47.   It was noted in Adam's medical records that Angela had expressed concern to the pediatrician that Eric was giving the child medicine "to make him constipated." She also

---

[10] Because the boys were too young to express a preference, *see* Miss. Code Ann. § 93-11-65(1)(a) (Rev. 2018), the chancery court did not consider that factor.

alleged that Adam was being abused by Eric's parents. However, the pediatrician examined the child and found nothing that would raise any suspicions. Furthermore, the Department of Human Services had investigated the claim and found it to be unsubstantiated.

¶48. At the November 2018 hearing, the GAL stated that when she spoke to Dr. Wurm, he did "not have any concerns for the children's overall well-being." This testimony is supported by the children's medical records. Although Angela had expressed concern with Adam's gaining weight, all medical records stated that both children were healthy overall, and the chancery court noted that both parents testified the children were otherwise "physically and mentally healthy." We find credible evidence to support the court's finding.

### ii. Continuity of Care

¶49. The court found this factor favored the mother, noting Angela's testimony that from the time the children were born until 2017, the children were with her the majority of the time. In 2017, the custody order was modified to one week-on/one week-off between both parents. In 2018, Eric was awarded temporary physical custody. However, this Court has recognized that a "chancellor must conduct an *Albright* analysis and decide the issue of permanent custody de novo regardless of the temporary order." *Sanders v. Sanders*, 281 So. 3d 1043, 1054 (¶43) (Miss. Ct. App. 2019). We therefore find the testimony supports the court's finding that this factor favored Angela.

### iii. Parenting Skills

¶50. Angela testified that the boys like to help her cook. She takes them to church and to

different activities, such as dance classes and educational museums. Eric testified that he helps the children with their homework and plays games with them. Therefore, the court found this factor was neutral.

¶51. Angela contends on appeal that the chancery court failed to "weigh the totality of the substantial evidence that Eric is not providing necessary medical care for the children since being awarded full custody[.]" She testified at trial that she "honestly" did not think Eric loves the children, noting his delay in taking Adam to a dental appointment. She also felt he was trying to keep her out of the children's lives. With regard to the dental concerns, Eric explained that he obtained a second opinion regarding Adam's cavity and wanted to wait on the procedure since the child was not experiencing any issues. The court admonished Eric to get any necessary medical care done immediately but nevertheless found that there was testimony that Eric had gone to the doctors' visits and followed the doctors' advice. We find that the evidence supports the court's determination that this factor is neutral.

### iv. Willingness and Capacity to Provide Primary Childcare

¶52. Both parties testified they wanted full custody and expressed a willingness to co-parent; so the chancery court found this factor was neutral. The court's finding is supported by the testimony.

### v. Employment and Responsibilities of Parents

¶53. The chancery court determined that this factor favored neither party, and we find the ruling is supported by the testimony. Angela is a registered nurse, working twelve-hour

shifts three days a week. She stated that during the week, her mother would help with caregiving when she was at work; so the court determined she was "able to provide child care."

¶54. Eric testified that he was employed by the City of Gulfport and worked either 6:00 a.m. to 2:30 p.m. or 7:00 a.m. to 3:30 p.m. Although Angela notes on appeal that Dr. Alford testified Eric was "anxious" about possibly losing his job because his employer was critical of his work, there was no evidence presented to show Eric was not gainfully employed at the time of the court's ruling. Eric also had child-care assistance from his parents.

*vi.    Parent's Physical and Mental Health, Age, and Moral Fitness*

¶55. Angela, who was thirty-five years of age, testified that she was in good physical condition and that she had not been diagnosed with any mental disability, nor was she on any medication. She noted that her "Christian faith" was important to her and that honesty was very important to her. Eric was thirty-one years of age. He testified that he was in good physical and mental health and takes no medication. The GAL report noted that Eric has "gout." Eric admitted that he did not attend church. He also admitted that his and Angela's relationship had been troubled, and he confessed to having issues with controlling his temper during their marriage. The chancery court found this factor favored Angela. This ruling is supported by the testimony.

*vii.    Emotional Ties Between the Parent and Child*

¶56. The court noted Angela's testimony that she had a "good, loving relationship" with

25

the children. Eric had lived with his parents since the couple separated, and he also averred that his relationship with the children was good. Lockley testified that although the children seemed more emotionally attached to Angela, such attachment is common for young children, and both children expressed they wanted equal time with both parents. The court therefore found this factor was neutral, and we find no abuse of discretion in this finding.

*viii.    Home, School, and Community Record of the Children*

¶57.    The chancery court determined that this factor favored neither party. The testimony supports the court's finding. Both children attended school. Angela said that the boys also attend vacation bible school at her church and that they played baseball. Both parents supported the boys in their team sports, and Angela took them to a dance class for a while. The testimony also showed the father took them to do outdoor activities as well.

*ix.    Any Other Factor Relevant to Child Custody*

¶58.    The chancery court noted the lengthy and contentious litigation regarding the issue of custody, which had "consumed" both households. The court further found it evident from the testimony that the grandparents had contributed to the "damage" to the relationships. The court also recognized Eric's testimony that he said and did things he should not have. The court went on to address Dr. Alford's findings, particularly that both parties "are both quite practiced in presenting negative views of each other." Dr. Alford also disagreed with Angela's view that the children were "damaged."

¶59.    Despite the chancery court's finding no *Albright* factor weighed in Eric's favor, the

court nevertheless concluded in the final judgment "that the best interest of the minor children would be served by awarding physical custody to Eric." Admittedly, our Court has recognized that "[a]n *Albright* analysis is not a 'mathematical formula.'" *Bingham v. Johnson*, 322 So. 3d 948, 952 (¶19) (Miss. Ct. App. 2021) (quoting *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001)). While "all the *Albright* factors are important, . . . the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Id.* (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)). "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005.

¶60. The court did not fully explain its reasoning for the custody award, except to state that "total consideration" was given to all the evidence presented at trial, which would have included the GAL's recommendation that Eric be given sole physical custody. Thus, our first inclination is to reverse and remand for the chancery court to provide a more detailed explanation for its custody award, particularly in light of the fact that none of the *Albright* factors weighed in Eric's favor. We are mindful, however, that the Mississippi Supreme Court has held, "A corollary principle is that with respect to issues of fact where the chancellor made no specific finding[,] we are required to assume that the chancellor resolved all such fact issues in favor of [the] appellee." *Smith v. Todd*, 464 So. 2d 1155, 1157 (Miss. 1985). More recently, in *Rankin v. Rankin*, 323 So. 3d 1073 (Miss. 2021), the supreme court reiterated this holding, finding that although the chancery court had failed to make "a

specific, express finding" as to the appellant's credibility in a divorce proceeding, "we are required to assume that the [court] resolved this fact issue in favor" of the appellee. *Id*. at 1078 (¶14) (internal quotation marks omitted) (quoting *Smith*, 464 So. 2d at 1157). Moreover, despite the court's failure to explain fully its reasoning for awarding Eric custody, we find there is credible evidence to support the chancery court's ruling. *See Sootin v. Sootin*, 737 So. 2d 1022, 1026 (¶13) (Miss. Ct. App. 1998) ("Even where the specific basis of a decision is not stated in the chancellor's opinion, the decision will not be disturbed if substantial evidence can be found in the record.").

## II. Whether Eric's confessing to divorce on the ground of habitual cruel and inhuman treatment statutorily precludes him from being awarded custody.

¶61. Noting the lengthy litigation, the new chancellor asked if either party would admit to the ground of habitual cruel and inhuman treatment, assuring them, "All rights would be preserved that any party would have to any argument of equitable distribution or custody or anything else. And in my opinion in this case, because of the 1,735 days, *it would adversely affect no one*." (Emphasis added). Eric's counsel responded, "We admit it," and Eric confessed to a divorce on that ground.[11] The court subsequently granted Angela a divorce "on the statutory grounds of Habitual Cruel and Inhuman Treatment, pursuant to Section 93-5-1[.]"

---

[11] Neither party has raised the issue of whether a party may confess to grounds for a divorce; nor have they challenged the divorce judgment. As such, we do not address that question.

28

¶62. Angela contends that Eric's confessing to a divorce on this ground precludes him from having sole physical custody of the children. She cites Mississippi Code Annotated section 93-5-24(9)(a)(i) (Rev. 2018), which provides that "there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence." The statute further provides:

> The court may find a history of perpetrating family violence if the court finds, by a preponderance of the evidence, one (1) incident of family violence that has resulted in serious bodily injury to, or a pattern of family violence against, the party making the allegation or a family household member of either party.

*Id.*

¶63. Angela argues that she met her burden to prove a history of family violence, "particularly since Eric admit[ted] to assaulting Angela while she was holding their infant son, [James], placing the infant child in the zone of danger from his attack and in fact, forcibly ejecting [him] from Angela's arms causing him to fly into the couch." The trial transcript indicates, however, that this assertion actually was made by Angela during her direct testimony, and Angela has not demonstrated where in the record Eric admitted to this specific behavior. Additionally, the only official charge of domestic abuse filed against Eric was the August 2016 ex parte emergency protective order, which was later dismissed on motion by Angela, the petitioner.

¶64. Angela also asserts that "there was no need to make any finding of domestic violence because Eric admitted to the allegations of [her] counterclaim." Eric agreed that he "had

29

treated [Angela] in a habitually cruel and inhuman fashion" and admitted that he had punched walls in their home. He explained that their "entire relationship was contentious" and that they "were at each other's throats all the time." But he denied any physical abuse, and he specifically denied that he had admitted to "domestic violence." He claimed instead that Angela was the one who had behaved violently (e.g., chasing his parents' car down the road while James was in her arms).

¶65. Regardless, section 93-5-24(9)(a)(iii) enumerates certain factors that may rebut the presumption, including (1) a demonstration that the other parent's mental illness affects the best interest of the children, (2) successful completion of a parenting class by the perpetrator, and (3) a determination of whether the perpetrator "had committed any further acts of domestic violence." There was testimony by Eric and his parents that Angela had acted erratically in the past (e.g., beating herself with a board and yelling and screaming at Eric's parents). On the other hand, Angela submitted to a mental evaluation, and there was no conclusive report that she suffered from any diagnosable mental illness, except for Dr. Alford's conclusion that Angela had a "possible" personality disorder and PTSD. Nevertheless, the evidence further demonstrated that Eric had completed his co-parenting class and had attended numerous sessions with Dr. Alford and Lockley. Dr. Alford noted that Eric "seemed very controlled and calm whenever he was in the sessions with Angela or with the children." When asked by Angela's attorney about the "domestic violence" issue as it related to custody, Dr. Alford opined, "I have confidence that Mr. Lambes is not abusive

to the children. . . . I have seen no evidence of abuse, physical abuse of the children." Lockley stated that Eric was attentive and appropriate with the boys. Lastly, since 2015, there was no credible evidence presented of any family violence perpetrated by Eric toward either Angela or the children.

¶66. In her final report, the GAL acknowledged the "[p]resumption against custody to a violent parent"; yet she recommended that Eric be given sole physical custody, reasoning:

> Dr. Alford's conclusion that the mother has a personality disorder, the father's completion of parenting class and ongoing sessions with Dr. Alford, compliance with all orders of the court and the lack of any violence during the pendency of this long standing litigation, rebut the presumption and *Albright* factors should be considered.

We agree that the record demonstrates that any statutory presumption was rebutted by a preponderance of the evidence. Further, although the chancellor did not specifically reference the GAL's recommendation in the bench ruling, the chancellor did state that he considered the totality of the evidence, including "the exhibits, the testimony, the investigations that have been done, [and] *the reports that have been entered*." (Emphasis added).

¶67. In determining custody, "[t]he chancellor has the ultimate discretion to weigh the evidence the way [he] sees fit in determining where the child's best interest lies." *O'Briant v. O'Briant*, 99 So. 3d 802, 806-07 (¶19) (Miss. Ct. App. 2012) (quoting *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012)). Affording the chancellor "ultimate discretion" in his findings, we find no manifest error and affirm the decision to award Eric

31

sole physical custody.

### III. Whether the GAL made material misrepresentations in her report.

¶68. In the order appointing the GAL, the chancery court directed Sonnier to "investigate, make recommendations to the [c]ourt and enter reports, and act in all respects to protect the best interest of the minor children." The GAL filed updated reports prior to each hearing and trial. Angela contends on appeal that the GAL's "false statements and misrepresentations perpetrated a fraud on the trial court." Particularly, she asserts the GAL "downplayed the abuse and domestic violence" and "up-played Eric's concern over Angela's bi-polar condition." Essentially, she argues the GAL only put forth facts "that would support Eric's request to be primary custodian."

¶69. We first note that the supreme court has held that "a chancellor's custody order" will be upheld, "even if it is partly based on a less-than-perfect guardian-ad-litem investigation." *Smith v. Smith*, 206 So. 3d 502, 512 (¶22) (Miss. 2016). Here, the GAL spent more than three years interviewing the parties, the children's teachers, counselors, and the children's physicians. Her last report was thirty-eight pages. Therefore, we find nothing inadequate about the GAL's investigation.

¶70. With regard to Angela's claim that the GAL omitted certain facts and showed bias toward Eric, the reports indicate that the GAL thoroughly addressed Angela's various allegations of abuse, not only toward herself but also toward the children. These allegations, particularly with regard to the children, were not substantiated by the testimony or other

evidence. Accordingly, we find the record does not support Angela's argument that the GAL's report contained misrepresentations warranting reversal of the court's judgment.

¶71. Furthermore, the chancery court noted during the October 2019 trial that the GAL's report was not received as "substantive evidence" but instead "as, number one, an officer of this court, and in furtherance of her duties, having been appointed by the previous chancellor in 2016, and to detail her work throughout her representation of these two children[.]" Angela then withdrew any objection to the admission of the GAL's report. We find it evident that after hearing lengthy testimony from all of the witnesses and reading all the reports and the record, the chancellor made his own decision based upon independent findings of fact.

¶72. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.; McDONALD, J., JOINS IN PART.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶73. Because the trial court found every single *Albright* factor either neutral or in favor of the mother yet granted custody to the father, I must respectfully dissent in part.

¶74. "Determining custody of a child is not an exact science." *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001). And "[w]hile the *Albright* factors are extremely helpful in

33

navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula." *Id.*

¶75. These crucial holdings have allowed us to better review "close cases" in child custody disputes, keeping in mind that it's not a football game; it's a child's life. Just because one party gets more "points" doesn't mean they are awarded custody of the child since "the polestar consideration in child custody cases is the best interest and welfare of the child." *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

¶76. While the test may not be an "exact science" or a "mathematical formula," it *is* a test. The trial court applies the *Albright* factors to ascertain which parent will serve as the custodian of the child in accord with the child's best interest and welfare. So when *every single Albright factor* is found neutral or in favor of only one parent, the *only* possible ruling is to find that the prevailing parent is the one who should receive custody.

¶77. The question is not just whether the trial court committed manifest error. The *Albright* factors guide us to the polestar consideration in child custody cases; to find all the factors either neutral or in favor of one parent but grant custody to another ignores how *Albright* works. As a result, I believe we must reverse because the trial court was "manifestly in error" and "has applied an erroneous legal standard," as the ruling below leaves the concern that *Albright* was not followed. *Lee*, 798 So. 2d at 1288 (¶14).

¶78. In all other respects I agree with the majority.

**WESTBROOKS, J., JOINS THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**

34