# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01006-COA

ROBERT LANE McLELLAN, JR.                                    APPELLANT

v.

DAWN RAINEY McLELLAN                                          APPELLEE

DATE OF JUDGMENT:              08/10/2022
TRIAL JUDGE:                   HON. WILLIE JAMES PERKINS SR.
COURT FROM WHICH APPEALED:     LEFLORE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        JONATHAN RYAN TAYLOR
ATTORNEYS FOR APPELLEE:        A. LEE ABRAHAM JR.
                               JACOB MICHAEL JENKINS
NATURE OF THE CASE:            CIVIL - CUSTODY
DISPOSITION:                   REVERSED, RENDERED, AND
                               REMANDED - 04/16/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND SMITH, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.    Dawn and Robert (Robbie) McLellan consented to irreconcilable differences divorce and stipulated that the chancellor would determine custody of their three children. The chancellor found that three *Albright* factors[1] favored Robbie and that all other factors were neutral. The chancellor then granted Robbie physical custody of the parties' two teenage sons but granted Dawn physical custody of their five-year-old daughter.[2] On appeal, Robbie argues that the chancellor abused his discretion and unjustifiably separated the children by

---

[1] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

[2] The chancellor also granted the parties joint legal custody of all three children and granted both parties visitation.

granting Dawn physical custody of their daughter. After review, we agree that the decision to grant Dawn physical custody of the parties' daughter was arbitrary and an abuse of discretion, is not supported by substantial evidence, and unjustifiably separated the siblings. Therefore, we reverse and render on that issue. We remand the case for the chancellor to determine visitation for Dawn.

## FACTS AND PROCEDURAL HISTORY

¶2. Dawn and Robbie married in 2005 and had three children: Frank (born in 2006), Joe (born in 2007), and Ruth (born in 2017).[3] In 2019, Dawn and Robbie separated. In 2021, Robbie filed for divorce, and Dawn answered and filed a counterclaim for divorce. In 2022, the parties consented to an irreconcilable differences divorce and stipulated that the chancellor would determine custody of their children, visitation, and child support.

¶3. Post-separation, Dawn and Robbie temporarily divided custody of their children on a voluntary basis without a court order. Frank lived with Dawn in Belzoni and attended Humphreys Academy, while Joe lived with Robbie in Greenwood and attended Pillow Academy.[4] Dawn and Robbie alternated custody of Ruth every four days, and at the time of trial, Ruth was attending pre-kindergarten at Pillow. Dawn and Robbie both testified that all three children were rarely together under their temporary arrangement. Because both parties wanted their children to live together regularly, their temporary arrangement was not

---

[3] We use fictitious names for the minor children in the interest of their privacy. Tragically, Frank died while this appeal was pending.

[4] Dawn's mother, Liz Rainey, testified that Frank actually stayed with her "[m]ost of the time" when Dawn did not have Ruth, and even when Dawn did have Ruth, Frank stayed with Liz three to four days a week on average.

2

acceptable to either of them. Thus, they stipulated that the chancellor would decide the custody of their children, and the chancellor heard two days of testimony on that issue.

¶4. On the first day of trial, Joe told the chancellor he wanted to live with Robbie[5] because Robbie is "more predictable to live with," Joe can "count that [Robbie] is always going to be there," and Robbie "takes care of" him. Joe described his relationship with Robbie as "good" and "stable." Moreover, Joe said Robbie had good parenting skills and helped him with his schoolwork. Joe testified that Robbie was also attentive to Ruth, taught Ruth her letters and numbers, cooked, and did laundry. Joe thought it would be in his and his siblings' best interests to live with Robbie.

¶5. Joe acknowledged he had struggled in some of his classes at Pillow Academy, had "failed . . . one nine weeks in science," and was required to attend summer school. He testified that his grades were better when he attended Humphreys Academy in the seventh grade but only because his classes at Humphreys covered material he had already learned "in previous grades at Pillow." Joe also testified that he studied just as hard at Pillow as he had at Humphreys, but Pillow was more academically challenging than Humphreys. In addition, Joe testified that Robbie requires him to study and helps him with homework daily and will "ground" him if he "do[es] bad on a test or something." Dawn acknowledged Joe had "always struggled some academically," even when he attended Humphreys and before the parties separated. Joe believed he was getting a better education at Pillow, and Dawn and her mother both acknowledged that Pillow was academically "better" than Humphreys.

---

[5] Joe had previously signed a sworn statement that he wanted Robbie to be his custodial parent. The statement was admitted into evidence during the hearing.

¶6. Diane McLellan, Robbie's mother, echoed Joe's testimony regarding Robbie's good parenting skills. Robbie lives only four blocks away from Diane, and they see one another almost daily. Diane testified that both Joe and Ruth are very close to Robbie and respect him. Diane ordinarily takes Joe and Ruth to school in the morning because Robbie has to be at work at 6:30 a.m., but she testified that Robbie always has their clothes laid out, backpacks ready, and lunches packed.

¶7. Joe was concerned about the prospect of living with Dawn because of her emotional issues and a lack of structure at her house. Joe testified that on one occasion, he awoke in the middle of the night at Dawn's house and could not find Dawn because she had left him and Ruth at home alone. He also testified that Dawn exhibited "road rage" and often cursed while driving. He described Dawn as "kind of bipolar, because she'll be just fine one second, and she'll drop something or forget where something is[,] she'll start crying[,] and then she'll get mad all at once."

¶8. Joe also testified that the curfew at Robbie's house is 8 or 8:30 p.m. on school nights and 9:30 or 10 p.m. on weekends, while Dawn allows Joe to stay out until midnight. Diane similarly testified that at Dawn's house, the children "are free to come and go as they please," "don't really have a curfew," and "are allowed to drink."

¶9. Joe testified that under Dawn's supervision, Frank drank beer, smoked marijuana, and vaped. Joe knew that Dawn had caught Frank drinking and vaping. According to Joe, Dawn also allowed Frank to drive his truck on public roads and highways without an adult before he obtained his driver's license. Joe testified that Dawn had allowed him and Ruth to ride

4

with Frank without an adult before Frank obtained his license. Joe testified that he had been in a car with Frank and his friend while they were smoking marijuana.

¶10. While Frank was visiting Robbie's home, Robbie found a vape, syringe, marijuana, and rolling papers inside one of Frank's bags. When Robbie confronted Frank about it, Frank "said that Dawn already knew about it, knew he had done it before." Frank then returned to Dawn's house. Frank told Dawn that the marijuana and vape were not his and belonged to a friend. Dawn testified that she believed Frank and had seen no evidence that he was using marijuana or vaping.

¶11. Robbie testified that Frank "prefers to stay [at Dawn's house] because he has an easier route to do things that he wants to do and not necessarily be disciplined." He further testified, "No doubt I would love for Frank to live with me," "but he's 16 years old" and "wishes to live in Belzoni," as "[t]hat's where the majority of his friends are, where he's been going to school." Robbie testified that Dawn was a "suitable parent" "for the most part," and he felt that if Frank were forced to live with him, Frank "would do nothing but rebel, and it would be a problem for everyone." Robbie also felt "it just wouldn't be good for [Frank's] mental health to be [forced to be] somewhere he doesn't want to be." Accordingly, Robbie did not request physical custody of Frank on the first day of trial.

¶12. Dawn has been involved in multiple verbal or physical altercations at Joe's and Ruth's sporting events. On two different occasions, Dawn went into the dugout during a baseball game while yelling and cursing at Robbie, who was coaching. At one of those games, Dawn

5

had seen "Maggie," whom she believed to be Robbie's "girlfriend,"[6] sitting with Diane. Dawn testified that she had already "had a discussion [with Maggie] about her sleeping with [Robbie]." Dawn testified she was angry that she could not "show up to watch [Joe's] game without [Maggie] being thrown in [her] face." Dawn admitted that she "probably was guilty of saying a cuss word or two," but she denied that she was "yelling, kicking, [or] screaming." However, Joe testified that Dawn "started yelling at Maggie," and "cussing her out." According to Joe, Dawn "dropp[ed] the 'F' bomb and accus[ed Maggie] of doing stuff with [Robbie]" in front of "maybe 10 [or] 15 people." Joe testified that at another game Dawn was "cussing" at Robbie during the game while Robbie was trying to coach third base.

¶13. Diane testified that on another occasion Dawn yelled at Maggie during a baseball game and later assaulted her in the parking lot. According to Dawn, the altercation began when Maggie approached her car as she was leaving with Ruth. Dawn claimed that as she was trying to get into her car, Maggie spit on her. In response, she "grabbed [Maggie] by the back of the head . . . and threw her down on the ground." Dawn testified that she was then confronted by two individuals, including "an old lady [who came] after [her] with a chair" and a tall man who got in her face, cursed, and threatened her. Dawn testified that she left the baseball fields quickly to "get [Ruth] to safety," but she was arrested a couple of days later as a result of the incident.

¶14. Joe and Diane testified about another incident when Dawn became angry in the

---

[6] Robbie testified that he did not have a "girlfriend." Joe also testified that Robbie did not have a girlfriend and that, to his knowledge, Maggie had never been to his house. Diane and Robbie's friend Lee Wiggins also testified that, to their knowledge, Robbie did not have a girlfriend.

parking lot after a game and threw a drink in Robbie's face. This incident occurred in front of a large crowd, including Joe and Ruth. According to Diane, "Robbie was holding [Ruth], [Ruth's] teammates were around," and Dawn "threw Coca-Cola all over everybody and was screaming and cussing." Diane testified that Ruth "was terrified and crying." However, Dawn testified that she threw only a "little water" at Robbie as she "shook [her] bottle at him," and Ruth spilled her own drink, which caused her to cry and scream.

¶15.   Diane also testified that Dawn had pulled into Diane's driveway behind Robbie and Ruth, "yelling and screaming and cussing." According to Diane, Dawn came onto her porch and "pushed Robbie into the storm door with [Ruth] in his arms and hit him in the face with her fist." Diane testified that Ruth "was screaming and crying." Diane took Ruth inside, and Ruth "was so upset that she threw up on [Diane] and wet her pants." Robbie testified that Dawn "tried to snatch Ruth from [his] arms," and Ruth "was screaming at [Dawn] . . . to stop" and trying to tell Dawn "she was hurting her."

¶16.   In contrast, Dawn testified that she went to Diane's house because Robbie would not answer her phone calls, and she (Dawn) did not know where Ruth was. Dawn testified that Robbie had just pulled into Diane's driveway when she arrived, and he got out of his truck and immediately began yelling at her. As Dawn removed Ruth from her car seat in Robbie's truck, she showed Ruth a photo of "Maggie," and she asked Ruth, "[W]ho is this?" When Ruth identified the woman as "Maggie," Dawn "realized that [Ruth] had been around Maggie." At that point, according to Dawn, Robbie "shoved" her, "grabbed [Ruth] from her[,] and took off towards the front door of [Diane's] house." Dawn testified that Robbie

7

grabbed her phone during the altercation and threw it inside the house. Diane testified that she called the police, and the police arrived soon thereafter.

¶17. About six weeks after the first day of trial, Robbie filed a motion to reopen the evidence, and the chancellor entered an agreed order granting the motion. The chancellor then heard testimony from Dawn and Robbie about two events that occurred after the first day of trial.

¶18. Robbie testified that Humphreys Academy's headmaster had notified him that Frank had failed a drug test, testing positive for cocaine and marijuana at a level indicating "everyday [marijuana] usage for an unknown period of time."[7] Robbie stated that while he had been "willing to let [Frank] live [with Dawn], as long as things could be all right," Frank "testing positive for cocaine . . . change[d] that whole perspective." Robbie now believed it would be in Frank's best interest to live with him. Dawn testified that she had scheduled a counselor for Frank to address his drug use. She also testified that she had begun checking Frank's room and truck and had "placed an app on [Frank's] phone" that would "give [her] notification" of "anything drug related, sex related, alcohol, [or] cussing."

¶19. Robbie also testified about a recent incident at a restaurant in Greenwood. Robbie, Dawn, their three children, Diane, and Robbie's father all met for supper to celebrate Joe's

---

[7] Robbie testified that he "discussed the [drug test results] thoroughly with the headmaster," who had "discussed it with the lab tech." Dawn later objected to Robbie's testimony about what the headmaster said the "lab tech" said. After Dawn objected, the chancellor instructed Robbie's attorney not "to ask [Robbie] about what the headmaster said," but the chancellor noted that Dawn "sat on [her] rights" by not objecting to Robbie's prior testimony. The drug test results, which were admitted into evidence without objection, show that Frank testified positive for cocaine, cocaine metabolites, and THC metabolites at levels above the screening and confirmation cutoff levels.

fifteenth birthday. According to Robbie, the dinner itself was amicable and enjoyable. But in the parking lot after dinner, Dawn "started yelling and hollering and cursing" and then attacked Diane, punching her twice in the eye. Diane had to go to the doctor because her eye was swollen to the point "[s]he couldn't see out of it." Photographs of Diane's swollen eye were admitted into evidence. According to Robbie, all three children witnessed the assault and were upset, and Frank and Ruth were crying. Robbie testified that when Dawn attempted to attack Diane again, Joe tried to stop her, and Dawn pushed Joe out of the way. The police arrived, put Dawn in handcuffs, and placed her in a patrol car.

¶20. Dawn claimed that Diane started the altercation by yelling at Ruth in the parking lot. According to Dawn, both Diane and Robbie then began yelling at Dawn, and Diane called Dawn a "coke head in front of her kids." Dawn responded by "slapp[ing]" Diane. Dawn testified that Diane and Robbie then attempted to video the altercation, and Dawn wrested Diane's phone from her. The police then arrived and arrested Dawn for simple assault.

¶21. As noted above, Robbie did not request physical custody of Frank during the first day of trial, but at the conclusion of the second day of trial, he requested custody of all three children. Dawn also requested custody of all three children.

¶22. The chancellor subsequently entered an opinion and final judgment addressing custody and related matters. The chancellor discussed each *Albright* factor, found that three factors—parenting skills, moral fitness, and Joe's preference—favored Robbie, and found that all other factors were neutral. The chancellor then stated, "Based on the *Albright* factors, . . . the parties shall have joint legal custody of the minor children, . . . [Robbie] shall have

9

paramount physical custody of [Frank and Joe,] and [Dawn] shall have paramount physical custody of [Ruth.]" The chancellor also granted Robbie visitation with Ruth and granted Dawn visitation with Frank and Joe. Each party was granted visitation every other weekend and during holidays, spring break, and summer. Under the parties' visitation schedules, all three children would be together during all visitation periods, including every weekend.

¶23. Robbie filed a motion to alter or amend the judgment or for a new trial in which he argued that the chancellor erred by (1) awarding Dawn custody of Ruth despite finding that no *Albright* factors favored Dawn and (2) separating the siblings without making any findings to justify the separation. The chancellor denied Robbie's motion, reasoning that there was no "per se rule" against separating siblings and that a "desire to avoid separation of siblings should not override a child's best interest in a custody determination." The chancellor stated that he had "considered all the evidence, including the fact that the parties made an agreement wherein [Dawn] had custody of [Frank and Ruth,[8]] and [Robbie] had custody of [Joe]." The chancellor stated he had also considered that Frank probably would have remained in Dawn's custody but for Frank's failed drug test and Dawn's "lack of immediate response." Finally, the chancellor stated he had considered that Robbie "continued to allow [Joe] to participate in sports" even though Joe had failed a science class.

¶24. Robbie appealed. On appeal, Robbie raises the same issues he raised in his post-trial motion to alter or amend the judgment or for a new trial.

---

[8] The chancellor's statement was incorrect with respect to Ruth. As discussed above, Dawn, Robbie, Diane, and Liz all testified that the parties' temporary agreement was to share custody of Ruth, alternating custody every four days.

**ANALYSIS**

¶25.   "This Court will not reverse the chancellor's custody decision unless the chancellor abused [his] discretion, was manifestly wrong, or clearly erroneous, or applied an erroneous legal standard." *Smith v. Bellville*, 301 So. 3d 678, 682 (¶8) (Miss. Ct. App. 2020) (quotation marks and brackets omitted).   "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).   In other words, the issue is not whether this Court "agrees with the chancellor's ruling" but only whether "substantial evidence" supports the chancellor's ruling. *Id.*  We review questions of law de novo. *Vassar v. Vassar*, 228 So. 3d 367, 374 (¶23) (Miss. Ct. App. 2017).

¶26.   "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005.  The chancellor's evaluation of the child's best interest must consider the following factors: (1) the age, health, and sex of the child; (2) which party has had "continuity of care"; (3) the parties' "parenting skills"; (4) the parties' "willingness and capacity to provide primary child care"; (5) the parties' employment responsibilities; (6) the parties' "physical and mental health and age"; (7) the "emotional ties of parent and child"; (8) the parties' "moral fitness"; (9) "the home, school and community records of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each party; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id.*

11

¶27.    The chancellor must address each applicable *Albright* factor, *Powell v. Ayars*, 792 So.

2d 240, 244 (¶10) (Miss. 2001), but the chancellor need not decide that each factor favors

one parent or the other. *Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008).

Nor does *Albright* require the chancellor to award custody "to the parent who 'wins' the most

factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). Rather, "the

chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson*

*v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). Thus, we review the chancellor's

application of the *Albright* factors for abuse of discretion, giving deference to the weight he

assigned each factor. *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016).

¶28.    While the *Albright* factors help to determine the best interest of the child, our law also

recognizes "a preference for keeping siblings together." *Kimbrough v. Kimbrough*, 76 So.

3d 715, 726 (¶64) (Miss. Ct. App. 2011). To be sure, "the paramount concern [remains] the

best interest of the child," *id.*, and "the separation of siblings should not override a child's

best interest." *Owens v. Owens*, 950 So. 2d 202, 212 (¶35) (Miss. Ct. App. 2006). But

"siblings should be kept together whenever possible. In essence, the rule from our case law

is that the non-separation of a child from his or her sibling is usually in a child's best

interest." *Id.*[9]

---

[9] In some cases, our Supreme Court has articulated the preference against separating
siblings in even stronger terms. In *Mixon v. Bullard*, 217 So. 2d 28, 30-31 (Miss. 1968), the
Supreme Court stated that a "court should in all cases attempt, insofar as possible, to keep
the children together in a family unit. It is well recognized that the love and affection of a
brother and sister at the ages of these children [(nine and thirteen)] is important in the lives
of both of them and to deprive them of the association ordinarily would not be to their best
interest." In *Sparkman v. Sparkman*, 441 So. 2d 1361, 1362-63 (Miss. 1983), the Court
stated that *Mixon*'s language, though "dicta," "expresses a common sense recognition of the

¶29. We review the chancellor's decision in this case with these principles in mind. The chancellor found that the parenting skills and moral fitness factors and Joe's preference all favored Robbie. Regarding parenting skills, the chancellor found that Robbie was more "willing[] to hold [Frank] accountable for smoking . . . marijuana" and using cocaine and that Dawn allowed Frank to drive a truck without a driver's license. Regarding moral fitness, the chancellor found that Dawn had been "in several altercations" at the children's sporting events and had been arrested for assaulting the children's grandmother. In contrast, there was no evidence of any similar behavior by Robbie. The chancellor also found that Joe wanted to live with Robbie because Robbie "is predictable and more stable" than Dawn.

¶30. The chancellor found that the remaining *Albright* factors were neutral. He found that "[p]rior to the separation, . . . both parties supported and cared for all minor children," and post-separation, they had divided responsibility pursuant to their shared custody arrangement. He also found that both parties had jobs[10] that allowed them to care for the children, as well as family members who lived nearby who would help them. In addition, the chancellor found that the "emotional ties" factor did not favor either party—although Robbie had a better relationship with Joe, Dawn had a better relationship with Frank. Regarding the home, school, and community record of the children, the chancellor noted that Dawn thought

ordinary facts of life, that in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of children to be separated." Finally, in *Carson v. Natchez Children's Home*, 580 So. 2d 1248, 1257 (Miss. 1991), the Court stated that "the imperative that siblings should not be required to live apart" is "[a]lmost as strong" as the natural-parent presumption.

[10] Robbie was employed as a welder for Viking Range. Dawn worked as a customer service representative for Heartland Catfish.

"sports may be the cause of [Joe's] low grades" but that Robbie disagreed. The chancellor found this factor did not favor either party. The chancellor deemed the remaining factors neutral with relatively little discussion.

¶31. Although the chancellor's original opinion included a sufficient discussion of the *Albright* factors, the opinion did not mention or consider the law's longstanding preference for keeping siblings together.[11] Moreover, following the chancellor's discussion of the *Albright* factors, the opinion simply declared—in a single sentence—that Robbie would have custody of Frank and Joe, while Dawn would have custody of Ruth. The opinion did not explain *why* Dawn should have custody of Ruth despite an *Albright* analysis that clearly favored Robbie. Nor did the opinion explain *why* the children should be separated.

¶32. After Robbie raised these issues in his post-trial motion, the chancellor observed (correctly) that there is no "per se rule" against separating siblings. The chancellor then provided three justifications for separating Ruth from her brothers: (1) the parties' temporary "agreement wherein [Dawn] had custody of [Frank and Ruth,] and [Robbie] had custody of [Joe]"; (2) the fact that but for Frank's failed drug test and Dawn's "lack of immediate response," Frank might "have remained in [Dawn's] custody"; and (3) the fact that Robbie "continued to allow [Joe] to participate in sports" despite his academic struggles. Finally, the chancellor stated that "[t]he evidence revealed no issue with [Ruth]" and that it was "in [Ruth's] best interest" to be in Dawn's custody.

¶33. The difficulty we have with the chancellor's custody decision is that despite two

_____

[11] The chancellor's *Albright* analysis concluded as follows: "Other Relevant Factors: The Court finds any other factors not considered . . . herein shall be considered neutral."

14

opportunities to address these issues, the chancellor did not identify any factually accurate reason for separating Ruth from her siblings or awarding custody to Dawn. The chancellor's first reason simply misstated the facts. As discussed above, the parties *shared* custody of Ruth on an equal basis under their temporary agreement. As to the chancellor's second reason, neither Frank's failed drug test nor Dawn's "lack of immediate response" explains why *Dawn* should be granted custody *of Ruth*. If anything, those facts weigh against granting custody to Dawn. Finally, as to the chancellor's third reason, all witnesses, including Dawn and her mother, testified that Joe had always struggled in school—even before the parties separated. All witnesses also agreed that his grades had dropped when he returned to Pillow because Pillow was more academically challenging and a better school than Humphreys. There was no evidence that Joe's struggles were attributable to Robbie. To the contrary, Joe testified that Robbie required him to study and helped him daily with his schoolwork.

¶34. As stated above, *Albright* does not require the chancellor to award custody "to the parent who 'wins' the most factors." *Blakely*, 88 So. 3d at 803 (¶17). Indeed, the *Albright* "factors are not variables in a mathematical formula," *Smith*, 206 So. 3d at 512 (¶24), and are not "to be given equal weight in every case." *Divers v. Divers*, 856 So. 2d 370, 376 (¶27) (Miss. Ct. App. 2003). In addition, "the chancellor has the ultimate discretion to weigh the evidence the way he sees fit," *Johnson*, 859 So. 2d at 1013-14 (¶36), and even a "single factor" may be so important to a child's best interest or "weigh so heavily in favor of one party that equity would require granting custody to that parent." *Divers*, 856 So. 2d at 376 (¶27). But at the same time, "[t]he *Albright* factors are not to be used . . . in an arbitrary

15

manner." *Id.*

¶35.    Here, we cannot avoid the conclusion that the chancellor's application of *Albright* was arbitrary and an abuse of discretion. Substantial evidence supports the chancellor's findings that the parenting skills and moral fitness factors favor Robbie. The chancellor also properly credited Joe's testimony that Robbie is a more stable and dependable parent and provides a more structured home environment than Dawn. These factors all strongly favored granting custody of all three children to Robbie. In contrast, the chancellor identified no reason that custody should be granted to Dawn. Given our deferential standard of review, we would affirm if the chancellor had identified *some* reason, supported by the evidence, why it was in Ruth's best interest to be in Dawn's custody. But absent any evidence or reason that the chancellor's decision is in Ruth's best interest, we are compelled to say that the chancellor's decision was arbitrary and an abuse of discretion.[12]

¶36.    In addition, our law clearly recognizes "a preference for keeping siblings together." *Kimbrough*, 76 So. 3d at 726 (¶64). The description of that preference has varied over time. In some cases, our Supreme Court has referred to it as an "imperative" that applies "in the

_____

[12] *See Miss. State Dep't of Health v. Sw. Miss. Reg'l Med. Ctr.*, 580 So. 2d 1238, 1240 (Miss. 1991) ("An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone[.]"); *White v. State*, 742 So. 2d 1126, 1136 (¶42) (Miss. 1999) ("Judicial discretion is defined as a sound judgment which is not exercised arbitrarily, but with regard to what is right and equitable in circumstances and law, and which is directed by the reasoning conscience of the trial judge to just result. Rather than implying bad faith or an intentional wrong on the part of the trial judge, an abuse of discretion is viewed as a strict legal term that is clearly against logic and effect of such facts as are presented in support of the application or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing." (quotation marks and citations omitted)).

16

absence of some unusual and compelling circumstance." *Carson*, 580 So. 2d at 1257; *Sparkman*, 441 So. 2d at 1363. In other cases, we have said it "'is only one factor' to be considered in making a custody award." *Davis v. Stevens*, 85 So. 3d 943, 951 (¶35) (Miss. Ct. App. 2012) (quoting *Wells v. Wells*, 35 So. 3d 1250, 1257 (¶28) (Miss. Ct. App. 2010)). We also recognize that the preference "should not override a child's best interest in a custody determination." *Owens*, 950 So. 2d at 212 (¶35). But regardless of the precise weight attached to the preference, the chancellor's decision or the evidence in the record should at least provide *some reason* why a custody order that separates siblings is in the children's best interest.

¶37.    In this case, the chancellor properly granted Robbie custody of Frank and Joe because the totality of the *Albright* factors clearly favored Robbie. But the chancellor then granted Dawn custody of Ruth without articulating any rationale for doing so. Given our deferential standard of review, we would affirm if the chancellor's opinion or the evidence in the record provided some logical reason for separating these children. However, as recounted above, the chancellor identified no logical reason for this result—even after Robbie filed a post-trial motion raising this precise issue. For this reason as well, we are bound to conclude that the decision was arbitrary and an abuse of discretion on this record. *Sparkman*, 441 So. 2d at 1363 (reversing and rendering a custody order that separated siblings because neither the chancellor's opinion nor anything in the record "indicate[d] any compelling reason" for separating the children); *Sootin v. Sootin*, 737 So. 2d 1022, 1027-28 (¶15) (Miss. Ct. App. 1998) (reversing a custody order that separated siblings because the chancellor "gave no

specific basis for the split custody," and "the record itself contain[ed] no substantial evidence to account for the ruling"); *see also Owens*, 950 So. 2d at 207 (¶16) (affirming a custody order that kept siblings together because "our case law makes it clear that keeping siblings together is assumed to be in the best interest of a child, absent a showing that the circumstances in a particular case are to the contrary").

## CONCLUSION

¶38. The decision to grant Dawn custody of Ruth was arbitrary and an abuse of discretion and is not supported by substantial evidence because neither the chancellor's opinion nor any evidence in the record provides a logical reason for the decision or for separating these siblings. Accordingly, the decision to grant custody of Ruth to Dawn is reversed and rendered. Robbie is granted custody of Ruth, and the case is remanded for further proceedings consistent with this opinion, including a determination of Dawn's visitation.

¶39. **REVERSED, RENDERED, AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**